JOHNSON *et al.* *v.* GORDON, administrator, *et al.*

1. When a widow elects to take a gross sum in settlement of her claim for dower in her deceased husband's estate, the sum allotted to her should be estimated upon the basis of her age at the time of her husband's death, and upon the basis of the value of the lands of the estate at the time the gross sum is assigned to her, and she having, by virtue of her dower right, a vested interest in one third of the accruing rents and profits, she should likewise be allowed that sum in addition to the value of her dower-estate estimated as above indicated, subject to any proper deduction on account of anything she may have received upon such rents and profits, or to any fair charge against her for use and occupation of the realty.

2. Upon the death of a member of an insolvent copartnership, the deceased member being himself solvent as to his individual debts, but insolvent when both his own and the debts of the partnership are taken into account, a court of equity in administering, under the code of this State, the assets of his estate, and at the same time adjusting the relative rights of the creditors of the partnership and the creditors of the deceased person, should decree: first, that the former, as a class, be allowed to exhaust the partnership assets, and that, in the distribution of the same to the members of this class, the priorities among themselves, relatively to each other, be observed; second, that the individual creditors, as a class, be then paid from the individual assets of the deceased the same amount upon the total sum due this class as has been received by the partnership creditors from the partnership assets, and that, in paying this amount upon the claims due this class, the priorities among its members, relatively to each other, shall likewise be observed; and third, that the residue of the individual assets be then divided pro rata among both partnership and individual creditors, also keeping in view in this division the priorities of the several debts participating, and preserving therein the dignity of liens and other secured debts.

3. If the partner whose estate is being administered has pledged a portion of his individual property as security for a debt of the partnership creditor, full effect should be given to the lien created by such pledge, and this result should be accomplished by having him first compete with the partnership creditors, as above indicated, and then having the balance of his claim, if any, satisfied out of the proceeds of the pledged property, without regard to whether there will remain a sufficiency of individual property to pay to the partnership and individual creditors, out of both partnership and individual effects, a proportion of their debts equal to the proportion received by such secured creditor in consequence of the security afforded to him by such pledged individual property. If, however, after so appropriating the sum realized from the property pledged, there be still a portion of such secured debt unpaid, and there be a residue of individual effects, after advancing individual debts and other partnership debts until they have received a percentage equal to that paid upon such secured debt, such residue should be applied to the debts of all the creditors, both individual and partnership, including such creditor, pro rata, preserving priorities as indicated in the second headnote supra.

4. Where, by separate deeds executed under section 1969 et seq. of the Code of 1882 (Civil Code, §2771), two separate promissory notes were severally secured, but at the same time, by collateral instruments, the debtor contracted that each conveyance should operate as a security for the note described in the other, the effect of these instruments construed together was, as between the parties, to put in the creditor a title to all the realty described in both deeds as a security for both notes, and such security was effectual as against other creditors who acquired no lien, by judgment or otherwise, binding the property described in such deeds.

Argued March 2, 3, — Decided August 10, 1897.

Equitable petition, etc.    Before Judge Felton.    Bibb superior court.    November term, 1895.

*Ryals & Stone, John L. Hardeman* and *Hardeman, Davis & Turner,* for plaintiffs in error.

*Bacon, Miller & Brunson, Smith & Jones, Washington Dessau, Robert Hodges* et al., contra.

ATKINSON, J.    Johnson & Harris were a partnership engaged in business at Macon, Georgia.    Johnson died April 14, 1893, and Harris was left as surviving partner.    The partnership was insolvent; Harris was insolvent; the estate of Johnson was sufficient to pay his individual debts, but insufficient to pay both these and the firm liabilities remaining after applying to the latter the firm assets.    On the death of Johnson, J. S. Rodgers as his administrator took charge of his estate.

Subsequently, he was removed and W. M. Gordon was appointed administrator de bonis non. The widow of Johnson, with the assent of the administrator and the approval of the ordinary, on September 12, 1894, elected to take in lieu of her dower an amount of money to be estimated and determined by the commissioners appointed to assign dower. She agreed to accept certain lands at the value fixed in the appraisement of the estate, in place of money, and pay to the administrator in cash any excess of appraised value over the amount awarded her in lieu of dower. The commissioners awarded her $20,-931.55, which was, on November 22, 1895, paid to her by the administrator *in land* as agreed. This sum did not include rents and profits, or interest on dower from the death of Johnson to date of payment, and all of her rights as to this were expressly reserved. It was agreed that the amounts of rents and profits, or interest on dower, were each $1,010.20 a year from the death of Johnson. The widow had occupied the mansion-house from Johnson's death, and admitted her liability to account for its value for occupancy, which aggregated $6,500, if allowed the rents and profits or interest claimed.

At the time of Johnson's death he was indebted to the Macon Fire Insurance Company. This indebtedness was represented by two notes, each of which was secured by a deed to a separate piece of land. These notes were each in the usual form of a note secured by collateral, and recited that it was secured by such deed, describing the deed given to secure it. Each note contained a clause stating that the collateral securing it should also secure any other debt due from Johnson to the insurance company. The firm was also largely indebted to the Exchange Bank of Macon, which indebtedness was partially secured by the pledge of certain shares of stock of the Planters Real Estate & Warehouse Co., the individual property of Johnson, delivered to the bank. After Johnson's death, Harris as surviving partner transferred to the bank as further security for its debt nearly all of the choses in action due to the late firm. With the approval and by order of the ordinary of Bibb county, and by direction of a decree of the superior court, Rodgers as administrator made a settlement with Harris, the

surviving partner. By direction of this decree, in such settlement the estate of Johnson assumed the debts of the firm of Johnson & Harris and agreed to pay Harris $2,000, the administrator giving him a note as evidence of the same. Harris as surviving partner under this agreement turned over certain assets of the late firm to the administrator of Johnson, including all notes and accounts not previously transferred to the Exchange Bank.

On March 11, 1895, Gordon as administrator de bonis non and individually, with the Macon Fire Insurance Company and four other creditors of the firm of Johnson & Harris, brought an equitable suit to marshal assets, and for direction to the administrator in the payment of debts. The contentions and claims made at the trial, which are material to be here considered, were:

1st. Mrs. Johnson's contention that the sum of $20,931.55 received by her in lieu of dower should be augmented by the rents and profits (or interest on the sum assigned to her) from Johnson's death to November 22, 1895, less $6,500.00, the value for rent of the mansion.

2d. The claim of the individual creditors of Johnson that they should be fully paid out of the individual assets before the firm creditors should be paid anything; or, if this was not allowed, that they should be paid on individual debts a sum equal to the amount received by the Exchange Bank pro rata upon its claims, before firm creditors should participate.

3d. That the Exchange Bank should receive nothing from Johnson's estate until the individual creditors had received an amount pro rata on their claim, equal to what the Exchange Bank had received from its collateral on its debts.

4th. The claim of the Macon Fire Insurance Company based upon the notes and security-deeds held by it.

The presiding judge, who by agreement tried the case without the intervention of a jury, overruled the contentions of the widow and of the individual creditors. He held that the sum allowed in lieu of dower was in full of all of the widow's claims, and that she should receive nothing for rents and profits or interest. He decided that all of the creditors, both individual

and firm, were entitled to share equally in the estate of Johnson, the Exchange Bank sharing for the balance due to it after crediting all sums received from the collateral held by it. The claim of the insurance company for full payment was sustained.   We will now discuss the questions raised in this case by the assignments of error.

1. Is Mrs. Johnson entitled in addition to the sum of money found in lieu of dower, or the land taken by her instead of cash, to one third of the rents and profits of the lands of the estate from the time of Johnson's death to the time she received such cash or land?   The court below held that, in estimating the amount to be allowed in lieu of dower, the value of the lands at the time of the assignment in lieu of dower, and Mrs. Johnson's age at the time of Johnson's death, were to be taken into consideration.   This was unquestionably correct.   The law contemplates that the value of the lands at the time of the assignment shall be the value taken by the commissioners in determining the sum to be set aside absolutely.   The statute contemplates that the lands shall be sold by the representative of the estate, and that *out of the proceeds* the absolute sum shall be set aside.   This court has held that the price realized at such sale determines the value of such lands, and is *conclusive* as to such value.   *Smith* v. *Smith*, 39 *Ga.* 226, 230.   In the case at bar, by consent of all parties and under a consent decree, land was received in lieu of money.   By analogy, the value of such land at the time the assignment in lieu of dower was made is to be taken as the basis for appraising the sum to be allowed instead of dower.   Mrs. Johnson's age at the time of her husband's death should be taken in estimating the value of her dower-estate.   The widow's right to dower accrued instantly upon the husband's death.   *Truett* v. *Funderburk*, 93 *Ga.* 686, 690.   Marriage, seizin, and death of the husband while seized complete the right.   *Chapman* v. *Schroeder*, 10 *Ga.* 321.   When she receives possession, it is of an estate to which she has had the right of possession since the death of the husband.   It is an estate *from widowhood*, and embraces as well that part immediately succeeding the husband's death as any later period.   And this being so, when assigned, her right to

one third the income which has accrued between the death of the husband and the assignment of dower is well settled. *Austell* v. *Swann*, 74 *Ga.* 278, and authorities therein cited. ·

It is however insisted in this case, that as the widow received a sum of money absolutely in lieu of dower, or property of equal value, which was the same thing, and as the value allowed her was a sum equal to the value of the dower-estate from the time of the husband's death, taking her expectancy of life from that period, she has received, in the sum allowed, the cash value of the income of the dower lands during the time elapsing from the husband's death until the setting apart of the lands taken in lieu of dower. In this view we can not concur. The dower right being one which accrued immediately on the death of the husband, courts of equity proceed upon the principle that the right of the widow to have her dower assigned to her immediately after the death of her husband, draws after it the right to an accounting of the profits from that date. *Austell* v. *Swann*, supra; Woodward *v.* Woodward, 2 Rich. Eq. 28. In the case last cited, the Court of Appeals of South Carolina said on this point: "It is insisted in argument that the plaintiff's right to interest or mesne profits is concluded by the commissioners having assessed a gross sum in lieu of dower; but the right for an admeasurement of dower conferred on them no authority to take an account of the mesne profits or to commute them for money, nor has the court any warrant in law to delegate such a power to them, and upon referring to the return it will be seen they did not assume it." In the case at bar the agreed statement of facts shows that the jury, before whom the question of finding a gross sum in lieu of dower in this case came, did not include rents and profits from the husband's death, nor interest from such death on the sum allowed.

"A dowress is considered in regard to her title as being in possession of lands assigned to her by her husband. Her estate is a continuation of her husband's, and upon the assignment of her dower in legal contemplation she is in from the death of her husband." *Austell* v. *Swann*, supra. This being so in law, this widow is considered as having been, in con-

templation of law, in possession of her dower-estate from her husband's death, and to be entitled to the income therefrom from such period of time. Prior to the assigning of the sum of money absolutely in lieu of dower, the rents, issues and profits would be those derived from her one-third life-estate in the realty of which the husband died seized. Afterwards the income from her estate would be such income as might be derived from the cash allowed to her, or its investment. It is not true as matter of fact that, because the age of the wife at the date of the husband's death is taken as the point of time from which to compute the value of her life-estate, therefore the income thereof is included in such sum of money as may be assessed as its value. Could such assessment take place immediately, she would receive the sum of money assigned in lieu of dower at the date of the husband's death, and it would either be drawing interest if invested in interest-bearing securities, or if invested in land, as it was in this case, she would be receiving rents, issues and profits therefrom. In the case at bar, the agreed statement of facts admits that the rents and profits which she here seeks, or interest on the sum of money set apart to her, would amount to the same thing annually. There can be no question that the widow is entitled to this sum; so that it would make no difference in this case whether she were allowed interest upon the sum awarded, or rents and profits from the date of the husband's death. We think, however, that the true rule is that she is entitled to an accounting from the date of the husband's death of the issues and profits derived from her dower-estate in the condition in which it then stood, and that this right is not affected or debarred by the fact that she subsequently elects in the manner prescribed by law to have a sum of money set apart to her absolutely as representing her dower-estate.

It is admitted in this case that the widow has received in the use and occupation of the mansion-house the sum of $6,-500.00, for which she is accountable. Of course, in an accounting between the widow and the estate she must account for all sums received therefrom, which are properly chargeable against her, and this will be deducted from the gross amount

due her in lieu of dower, and the income prior to the assignment thereof.

2. The next question raised by the bill of exceptions is, what are the relative rights of the firm creditors of Johnson & Harris and the individual creditors of Johnson, the deceased, in the distribution of the assets of the firm of Johnson & Harris and of the estate of Johnson? The copartnership is confessedly insolvent. Johnson's estate is sufficient to pay his individual debts, but insolvent when both his own debts and those of the partnership are taken into account. It is contended that, this being so, this is not a case of an insolvent firm and of a deceased partner who is also insolvent, but that Johnson is to be considered solvent within the meaning of the code.

While for the purpose of administration of estates a difference is frequently recognized between firm debts and individual debts, yet every firm debt is also the debt of each general partner, and his entire property is as much bound for its payment, so far as he is concerned, as it is for the payment of any individual debt of the same character; so much so, that the bankrupt rule recognized by the English law, which became the rule in courts of equity for the administration of estates of insolvent firms having insolvent partners, has been frequently questioned so far as it sought to apply individual assets to the payment of individual debts to the exclusion of partnership debts; and while prior to the adoption of the code in this State the rule as laid down by the English courts was thoroughly recognized, where the proceeding was in equity, it was yielded to rather unwillingly by Chief Justice Lumpkin in the case of *Cleghorn* v. *Insurance Bank of Columbus, 9 Ga.* 319, and was held not to control or take away a right acquired by judgment and execution at law on the part of firm creditors against the separate estate of a partner. Chief Justice Lumpkin criticised the rule, upon the ground that its alleged foundation, viz., that firm creditors extended credit on the faith of firm assets, and individual creditors on the faith of individual assets, was not true in fact; that credit was extended in both instances in accordance with the creditor's

belief in the ability of his debtors from their assets of every sort to respond; and while the rule was acquiesced in and became adopted, to wit, that firm assets should be applied to the payment of firm debts, and individual assets to the payment of individual debts, so far as to exclude one class of debts from participation with the other, nevertheless the debts of a firm were none the less also debts of the individual partners.

The Civil Code, § 2627, speaking of partners, declares, "As to third persons all are liable, not only to the extent of their interest in the partnership property, but also to the whole extent of their separate property." If, therefore, the estate of Johnson while sufficient to pay his individual debts is not sufficient to pay the balance of the partnership debts not discharged by the partnership assets (it being conceded that his estate must respond for such balance), then the deceased partner, Johnson, is insolvent within the meaning of the Civil Code, § 2660. The deceased partner, Johnson, being insolvent within the meaning of the code, the case presented is one where the partnership is insolvent, and one of the partners is deceased insolvent, and falls therefore within the very language of the Civil Code, § 2660, which provides: "When a partnership is insolvent, and one of the partners is deceased insolvent, the creditors of the partnership, in equal degree with individual creditors, can not claim to share in the individual assets of the deceased partner until the individual creditors shall have first received upon their debts such a percentage from the individual assets as such partnership creditors have received from the partnership assets." It will be noted that this statute varies the English rule, which existed in the State up to the adoption of the code (see *Toombs* v. *Hill*, 28 *Ga.* 371, decided in 1859), and introduced a new rule for ascertaining the funds which in the case of an insolvent partnership and a deceased insolvent partner were to be applied respectively to the individual and firm debts. So far as we know, the only State having a similar rule of distribution is the State of Kentucky. See Fayette National Bank *v.* Kenney, 79 Ky. 133, a case in which the rule is laid down, that where partnership creditors exhaust the firm assets without being paid in full,

the individual creditors must receive a like sum from the individual assets; and when this is done the individual estate remaining will be distributed among all the creditors, partnership and individual, in proportion to the amounts of their respective debts.

The law of this State, for the distribution of the estates of a partnership and a deceased insolvent partner, varying the rule of equity which exists in the absence of statute, little aid is to be derived in its interpretation from decisions of other jurisdictions. In our own decisions on this subject, the questions raised in this case do not seem to have been presented. The object of the code seems to have been to alter the rule to the extent of preventing the individual debts from exhausting individual assets before partnership debts could participate therein. It recognizes the two as distinct classes, and directs as between the two that when the partnership assets have been applied to partnership debts, the same percentage shall be set apart from the individual assets, as a fund for individual debts as a class, as the partnership assets will pay upon its debts so considered. For example, if the total partnership assets are $10,000, and the partnership debts aggregate $30,000, 33⅓ per cent. of the aggregate individual debts shall be set aside out of the individual assets, before the firm debts can participate. When this percentage is so set aside, the residue of such assets are to be divided pro rata between both classes of debts.

The rule above laid down is simply a rule for the division of the assets, firm and individual, into proper funds to be applied respectively to firm and individual debts. The rights and priorities of these several debts in and to payment out of these funds is in nowise affected by this rule of division of the estate into such funds. The rights and priorities remain the same as they were under the old equity rule, and in distributing the fund to such creditors such rights and priorities must be observed and the funds distributed in accordance therewith.

In this case the assets both firm and individual were brought into hotchpotch by the decree rendered, and distributed pro rata among all of the creditors without distinction. Such distribution, while it might assign to *each class* a proper propor-

tionate amount, entirely ignores the respective rank of debts in each class inter sese, and for this reason, if no other, is not a proper rule of distribution.

3. The next question calling for decision is, what are the rights of the Exchange Bank of Macon, a firm creditor, to participation in the firm and individual assets; and in this connection what are its rights under the pledge made by Johnson of the stock owned by him individually, and delivered to it as security for the firm debts? The record shows that Johnson prior to his death had deposited with the Exchange Bank, as collateral security for the indebtedness of Johnson & Harris to it, 167½ shares of the capital stock of the Planters Real Estate & Warehouse Company, which was the individual property of Johnson. It was insisted in this case in the court below, that the Exchange Bank should be postponed on any payment out of the individual estate of Johnson until the individual creditors had each received an amount pro rata upon their claims equal to what the Exchange Bank had received upon its claims from collaterals so placed in its hands or held by it upon the firm indebtedness. The judge below overruled such contention, and entered up a judgment and decree that the Exchange Bank should first credit upon its debt the sums received by it from the collaterals so placed in its hands, and that as to any balance due the bank after so crediting it, it should, as a firm creditor for such amount, share equally with the individual creditors of Johnson out of his estate. So much of this ruling as relates to the relative rights of the individual and firm creditors in participating in the individual estate of Johnson has been heretofore discussed; but the question still remains for consideration, what is the true status of the Exchange Bank as to the shares of stock, the individual property of Johnson, deceased, which it held as collateral security, and how should it participate in the assets in order to properly protect its rights, if any, to its collateral security, and at the same time preserve the equities between the different creditors?

As already shown, primarily, firm assets should be charged with the payment of firm debts, and individual assets should not be called on until they are exhausted, and then only after

the individual creditors have received an equal percentage upon their claims. The Exchange Bank as a creditor of the firm of Johnson & Harris was entitled to the payment of its debt out of the firm assets. It was also entitled to the benefit of its pledge of the shares of stock, the property of Johnson, which had been deposited with it for that purpose. But such individual assets should not be called upon, nor such collateral security used, in giving effect to the rights of these parties in marshaling these assets, except where necessary for the protection of the Exchange Bank. If the firm assets had been sufficient to pay it and the other creditors, then a court of equity, charged with the marshaling of such assets and the liquidation both of the firm and individual estates, would have directed that such debt be paid out of the firm assets and no resort be had to the security consisting of the individual estate of Johnson. And a court of equity will now do pro tanto what it would, had the firm assets been sufficient, have done in whole. It will direct that the debt of the Exchange Bank be paid. according to its priority out of the firm assets, pro rata along with the other firm debts, and so far as possible extinguished from such firm assets. Then recognizing that the contract of pledge creates a lien for the payment of said debt, it will direct that the balance of said debt be paid out of the proceeds of such pledged shares of stock. In this way the Exchange Bank receives the full advantage of its contract of pledge, and at the same time the firm assets are made to bear as far as possible the burden of this firm indebtedness.

Should, however, there remain a balance of indebtedness due the Exchange Bank, which is not discharged after the application of the proceeds of its collateral, the question next recurs, what are its rights to participate with the other creditors in the assets of Johnson, deceased? The individual creditors of Johnson having been advanced to a percentage equal to that received by the firm creditors, the general rule of law would be that all firm and individual creditors should now share pro rata in the balance of his estate. But, in the event last supposed, the Exchange Bank will have already received through its pledge of these shares of stock a large percentage out of

that estate. Its assets are equitable assets in the hands of the court for distribution. It is a favorite principle of the court of equity that equality is equity. Civil Code, § 3930. As was said by this court in the case of *Jordan* v. *Brown*, 72 *Ga.* 495, 498, "Equity delights in equality, and even in cases of mixed assets, partly legal and partly equitable, will so apply this rule as to produce general equality among those having claims upon the several kinds of assets." Says Mr. Justice Story: "In cases where the assets are partly legal and partly equitable, courts of equity will not interfere to take away the legal preference of any creditors to the legal assets. But, if any creditor has been partly paid out of the legal assets by insisting on his preference, and he seeks satisfaction of the residue of his debt out of the equitable assets, he will be postponed till all the other creditors, not possessing such a preference, have received out of such equitable assets an equal proportion of their respective debts. This doctrine is founded upon and flows from that which we have been already considering, that in natural justice and conscience all debts are equal; that the debtor himself is equally bound to satisfy them all; and that equality is equity. When, therefore, a court of equity is called upon to assist a creditor, it has a right to insist, before relief is granted, that he who seeks equity shall do equity; that he shall not make use of the law in his own favor to exclude equity, and at the same time insist that equity shall aid the defects of the law, to the injury of equally meritorious claimants. The usual decree in cases of this sort is, that 'if any of the creditors by specialty have exhausted (or shall exhaust) any part of the testator's personal estate in satisfaction of their debts, then they are not to come upon or receive any further satisfaction out of the testator's real estate (or other equitable assets) until the other creditors shall thereout be made up equal with them.'" 1 Story's Eq. Jur. (12th ed.) § 557.

Applying these rules, therefore, we hold that the Exchange Bank should not be allowed to participate with the other creditors after receiving the proceeds of its pledge, until such other creditors shall have been paid out of the remaining individual assets a percentage equal to the percentage paid upon such

secured debt.  When this is done, such residue should be then applied to all the debts of all the creditors, both individual and partnership, including the Exchange Bank, pro rata, preserving the priorities of the several debts participating, and preserving the dignity of liens and other secured debts as already indicated.

4. The remaining question to be disposed of is whether, under the facts presented by this record, the Macon Fire Insurance Company was entitled to be paid in full the debt represented by each of the notes executed to it by Johnson.  The Macon Fire Insurance Company held two notes of H. T. Johnson, each of which was secured by a deed under section 2771 of the Civil Code (section 1969 of the Code of 1882), the deeds being to separate pieces of property.  Each of the notes recited the deed securing it as being held as collateral security for its payment.  Each note also read as follows: " I have this day deposited with the Macon Fire Insurance Company to secure the prompt payment of the above note, or any other liability of myself to said company, due or to become due, or that may hereafter be contracted, deeds to the following property: [describing the property named in the deed executed to secure such note] and more particularly described in deed to said Macon Fire Insurance Co."

The property in question was sold by the administrator at administrator's sale, by an agreement with the creditors, who consented that the administrator should sell it free from their claims; it being provided, in behalf of the Macon Fire Insurance Company, that in no event should any title pass to the purchaser at said sale until the debt due the Macon Fire Insurance Company, principal and interest, was fully paid off and discharged, and that such sale should not affect the right, title or interest of the said Macon Fire Insurance Company in such property until the payment of its debt.  By a verdict taken in this cause upon a portion of the issues therein, in November, 1895, it was found by the jury that the sale made of such property by Gordon, administrator, should be confirmed, and that the title should vest absolutely in the purchaser on the payment of the debt of the Macon Fire Insurance

Company. And a decree was entered upon the same day, in accordance with such verdict.

Without regard to the effect of such verdict and decree, it is a well-settled principle of equity, in the absence of statute, that, except as against purchasers without notice, equity will look to the intention of the parties, and where the purpose to create a security for a debt upon particular property can be gathered, will give it effect. Professor Pomeroy states the general doctrine deduced from the authorities to be as follows: "The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. . . . The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done." 3 Pom. Eq. Jur. § 1235. See also Ketchum v. St. Louis, 101 U. S. 306, where the authorities are fully reviewed. Fourth St. Bank v. Walker, 165 U. S. 654.

This court has fully recognized the above doctrine. In the case of English v. McElroy, 62 Ga. 413, while holding that a deposit of deeds as collateral did not create such a lien as could be foreclosed at law, it held that in equity, as between the parties, "the complainant should be decreed to have a lien upon the land as a security for the payment of the money borrowed, and that the same be enforced by a sale thereof under a decree of the court." We see no difference in principle between this last case and the case at bar. The insurance company clearly had, under the terms of its notes and the deposit of the deeds, an equitable lien upon the land not specifically conveyed to secure the particular note, but embraced in the

deed securing the other note. And there being no one assert-
ing a claim as an innocent purchaser, or with a legal lien given
priority by the statute, it was the equitable right of the insur-
ance company to have its claims paid in full.

Except in the particulars mentioned in this opinion and in
the headnotes, we see no error in the judgment of the court be-
low. We therefore reverse the judgment in these particulars,
and affirm it in all other respects, and direct that there be a
rehearing in the light of the law applicable to this case, as
herein laid down.

*Judgment reversed in part; and in part affirmed, with directions.*
*All the Justices concurring.*