Livingston, Justice,
 

 delivered the opinion of the court, and, after stating the case, proceeded as follows : — In reviewing these proceedings, the first question necessary to decide is, to whom the policy, mentioned in the complainant’s bill, belonged, at the time of commencing the action on it. It does not appear, that the names of the parties interested -in the Abigail Ann, were disclosed to the company, at the time of applying for insurance, or that their names were inserted in the policy. There is, however, no doubt, that when it was effected, Gray & Pindar, and John H. Dearborne, were the owners ; but in what proportions does not appear, nor is it material now to be known, for whatever interest was held by Gray
 
 &
 
 Pindar, was regularly transferred to Dearborne, by their bill of sale, dated the 2'7th of May 1811. This bill of sale is for the whole ship, and its consideration is $5000. Some time after, in the same year, Gray & Pindar delivered to Henry Harford, as agent of Dearborne, the policy of insurance which had been made on it. Dearborne, being thus sole proprietor of the Abigail Ann and policy, on the 28th of October 1811, executed a bill of sale for the vessel, containing an assignment also of the policy, for valuable consideration, to John Spring, of the firm of Seth Spring
 
 &
 
 Sons.
 

 Some objections were made to the proof of the execution of the instrument’ ^ut *they were not listened to below, nor are they regarded as well founded by this court. The proof was such as is required, where a party to a deed and the subscribing witness are both dead. The handwriting of both was proved, and Maria Teubner, who testified to that of the witness, left no reasonable ground to doubt of his death. She was a creditor of this witness, and had taken some pains to obtain information where he was, but without success : her last account of him was, that he had entered on board an American privateer, and had not been heard of for four years. The credit of this witness, although the subject of some animadversion, is not impeached by any testimony in the cause, nor by anything which she herself has testified.
 

 It follows, then, that on the 28th of October 1811, Seth Spring & Sons became proprietors of the ship Abigail Ann, and of the policy mentioned in these pleadings, and
 
 primd facie
 
 entitled to the whole of the moneys recovered on it, although the policy itself was not, at the time, put into their hands. Our next inquiry will be, whether any of the other parties, who are
 
 *125
 
 now before us, have a lien on it, or any other title to these moneys, or to any part of them. The olaim of Haslett may be considered as out of the question — it having been postponed by the circuit court to that of the appellants, and there being no appeal from this part of the decree.
 

 Lindsay’s demand will first be examined. This is made up of the premium paid for effecting the insurance ; of an indemnity claimed by Mm for indorsing two bills of exchange for Dearborne, amounting to 400?. sterling, and for having become his bail; of the customary commissions for his trouble and attention in conducting the suit against the underwriters, and of the amount of a judgment which he obtained, on the 19th of April 1813, against Dearborne, on an attachment issued out of the common pleas for the district of Charleston, and which had been served on the complainants. This attachment was sued out on the 24th of February 1812. No evidence is perceived in the proceedings in support of any one of these claims, except that which is founded on the judgment in the attachment. In his answer, Lindsay says that the policy was effected on his application, but nowhere pretends or alleges that he paid the premium for insuring the Abigail Ann, nor is there any proof
 
 aliunde
 
 of this fact. On the contrary, Cray & Pindar, in their answer, expressly state, that it was paid by them, and was probably allowed in their account against Dearborne, in making up the award hereinafter mentioned. Haslett, in his answer, asserts that it was advanced by him. Now, although the answer of one defendant be no evidence against another, yet, in the absence of all proof to the contrary, and where a party observes a profound silence on a subject to which his attention could not but be excited, such answer, not varying from any allegation on his part, furnishes some evidence that he could not make the assertion, because the fact was, in reality, otherwise.
 

 *If this fact of the payment of the premium had been made out, the court would have been disposed to award Mr. Lindsay payment out of the proceeds of the policy, for although he had once parted with it, yet, coming to his hands again, to be put in suit, his lien for the premium would revive and be protected, unless the manner of his parting with it had manifested an intention in him altogether to abandon such lien.
 

 His claim for a commission for conducting the suit against the underwriters, is inadmissible, it appearing from the testimony of Harford, who transmitted the policy to him, and who is the only witness on this subject, that he has no right to make any such charge. Harford considers himself entitled to this commission, and has accordingly charged it to Dearborne, in an account annexed to his deposition. Now, as this is the witness on whom all the defendants, except Seth Spring & Sons, principally rely, they cannot complain, if his testimony, when unfavorable, is allowed its full operation against them. It is evident, then, from the declaration of this witness, that he considered himself as the merchant who was prosecuting the suit, and that Mr. Lindsay was only employed to deliver the policy to a professional gentleman, to bring the action. There is another obstacle in the way of this claim, which is, that Lindsay, in the business of this suit, acted, as Harford himself says, as his (Harford’s) agent. Now, there is not only no evidence of Harford himself being authorized by the owners of this policy, to bring any action on it, but it appears, that his detention of it was a violation of duty, *and that the action he brought, was
 
 *126
 
 more to answer Ms own purjtoses, and those of the other defendants, than to advance the interest of those whom he knew at the time to be assignees of the policy. In this state of things, nothing would be more unjust, than to permit this fund to be incumbered, as against Seth Spring & Sons, with the heavy charge of five
 
 per
 
 centum, in favor of any one of the parties, who, throughout the whole business, have had in view exclusively their own interest, and Avere acting in open hostility to those from Avhom they now demand this compensation. With what propriety can they now claim a commission from these gentlemen, when it is entirely or principally owing to their interference, that they have not to this day received any benefit from a judgment which Avas recovered for their use nearly eight years ago ?
 

 Lindsay’s claim to receive any part of this fund, on account of the two bills of exchange for
 
 2001.
 
 each, is equally unfounded. That he would have had a lien on the policy for this transaction, without an express contract (and none appears), even if he had never parted with its possession, is a proposition which may well be controverted ; but if such lien ever existed (which is not asserted), it is not like that for the premium advanced for an insurance ; the latter may well revive, in some cases, on a broker’s being restored to the possession of a policy, which had once been out of his hands ; it being no more than reasonable, that whoever acquires an interest in it, should generally take it, subject to such a charge. It *does not, however, follow, that liens, which may once have existed for other advances, or on other accounts, whether by agreement of the parties, or by the operation of usage or of laAV, should be placed on the same favored footing. If, while a policy is out of the hands of the insurance broker, as was the case here, it is assigned for valuable consideration and
 
 bond
 
 fide, it would be unjust, on its returning to his possession, to revive incumbrances, of which the assignee could have had no notice, nor any certain means of finding out; for he could not reasonably suspect, that such liens had ever existed in favor of one who had parted with the possession of the only thing by which they could have been enforced. Nor can it make any difference, whether the policy have been actually delivered to the assignee, provided the transfer were
 
 bond fide
 
 made, while out of the possession and power of the insurance broker. Upon the same principle it is, that a consignor loses his right to stop goods
 
 in transit'd,
 
 although the consignee have become insolvent, after such consignee, having poAver to sell, has disposed of them, before their arrival, to a third person, unacquainted with any circumstance to taint the fairness of the transaction.
 

 The next charge which Lindsay attempts to fix upon this fund, is an indemnification for becoming bail for Dearborne. Now, if a responsibility, so contingent and remote as one of this nature, could, by any possibility, without a very positive and express agreement, be turned into a lien on a policy of insurance, it does not appear, in what suits he *has thus become bail, nor whether he has not been released by the death of the principal from all liability ; and of course, any demand arising from such responsibility, if any ever existed, must be laid out of the question. And the answer which has already been given to his claim for indorsing certain bills of exchange, will also apply here.
 

 The judgment obtained in the attachment-suit may be as easily disposed of. It- is quite unnecessary to inquire, whether these proceedings abated by
 
 *127
 
 the death of Dearborne, if he were dead at the time; for at the time of issuing the attachment, and, of course, long before judgment, Dearborne ceased to have any interest in this policy, the same having been already assigned to John Spring, of the firm of Seth Spring
 
 &
 
 Sons. No attachment, therefore, against Dearborne, although served on the company, could render the property of another liable for his debts. The attachment of Lindsay, it may incidentally be observed, furnishes some proof that he had no great confidence in the liens which he now asserts against this policy.
 

 The title of Gray & Pindar remains to be examined. By their answer, they claim $502, as the premium paid for insurance on the Abigail Ann, and $50, paid as a commission for effecting the same. They likewise state, that large advances were made by them, between the 5th of April and 7th of August 1811, on account of the said ship, her cargo, pilotage and repairs ; and they also, it seems, became the bail of Dearborne in two several actions, amounting *to $1000, which they have since become liable to pay ; they were also indorsers of the two bills of exchange which were indorsed by Lindsay. After stating all these demands, they say, that upon closing the account between Dearborne and themselves, there was a balance in their favor of $1430.16, for which Dearborne gave them a bill of exchange on Logan, Lenon & Co., of Liverpool; that feeling uneasy and insecure from the responsibility resting on them, and aware that they could be indemnified only by a specific lien, they would not deliver to Dearborne the policy, but put it for safe-keeping into the hands of their friend, Henry Har-ford, for the express and avowed purpose of protecting them against all losses on the accounts aforesaid ; the said policy being also intended as a security for certain debts due by Dearborne to Harford. Now, without looking any further than the answer of these gentlemen, it is most manifest, that none of the demands or responsibilities which are stated in it, wore contracted on entered into, under any agreement or understanding with Dear-borne himself, as Harford would have us believe, that they should be secured by a lien on this policy, but that such lien is set up solely on the ground of a subsequent understanding between them and Harford, to whom it was delivered, for the purpose of protecting them against loss. To derive any benefit from such a delivery, or such an assent on the part of Harford, it should appear (which is not the case), that they had a right to exact, and Harford a right to accept of *the policy on these terms. Unfortunately for these gentlemen, the testimony of their friend and witness, Mr. Harford, most incontestably establishes, that they were bound by the decision of persons of their.own choice, of whom Harford himself was one, to deliver the policy, without annexing to such an act any condition or terms whatever; and also, that the authority of Harford extended only to its receipt and transmission to Mrs. Dearborne, the wife of Mr. John H. Dear-borne. On the 21st of September 1811, which is subsequent to all their advances, indorsements and engagements for John H. Dearborne, he and Gray & Pindar submitted all their controversies to two arbitrators, who, in conjunction with Harford, as umpire, awarded that Gray & Pindar should pay to Dearborne $66.77, and surrender to him the policy on the Abigail Ann, without unnecessary delay. Now, this award could not have been signed by Harford, if he knew of any lien to which Gray & Pindar were entitled on this policy. It was said, that no notice could be taken of this
 
 *128
 
 award ; but coming, as it does, from a witness of the party, who was himself umpire, and not being impeached, this court cannot, without injustice, shut its eyes upon it. If a bill for its specific performance might have been entertained, which was not denied, what higher or better evidence can the court have of the rights of the respective parties, at the time of the transactions referred to in the answer of Gray
 
 &
 
 Pindar? If judges of their own selection have directed them, as they had a right to do, to surrender *this policy, without delay, and unconditionally, to Dearborne, this court must now presume (and it is a presumption with which neither Gray
 
 &
 
 Pindar, nor Harford, can be justly offended), that the policy was delivered to the latter, pursuant to the award; and if not, that any condition with which they thought proper to accompany such delivery, if not a breach of the arbitration bond, would, at least, be a trespass on good faith ; and that no assent or understanding, on the part of Harford, who was without authority for this purpose, could confer any validity, or give any sanction to such an act. This award is also of importance, to show how entirely mistaken Gray & Pindar are, in supposing Dearborne, at the time they speak of, so largely in their debt, when it appears by this instrument, that the balance, although not a large one, was in his favor.
 

 As to Hartford’s power, it appears, from his own letters, that he had no other authority than to transmit the policy, when received, to the family of Dearborne. Accordingly, in a letter to Seth Spring
 
 &
 
 Sons, of the 26th of September 1811, he transmits, for Mrs. Dearborne, the bill of sale for the Abigail Ann. And in another letter of the 3rd of November following, to the same gentlemen, he apologizes for not sending on the policy, as it had not yet been received from Charleston. After this unequivocal evidence of what was his authoi-ity over this policy, it becomes quite unimportant to inquire, what agreements he may have made, or what orders he gave Lindsay respecting the proceeds of it. It is not too much *to say, that the one of the 13th of May 1813, in favor of Haslett, for the whole proceeds, after Lindsay’s retaining for himself his legal claim and expenses, was a palpable violation of duty, or breach of instructions, towards Dear-borne ; and it was properly said by the circuit court, “ that to vest any interest, hostile to that of Seth Spring & Sons, was certainly not in his power.” Gray
 
 &
 
 Pindar having been originally interested in this ship and policy, on which there was some reliance by their counsel, places them, as it regards a lien, in a condition less favorable than if such ownership had never existed ; for by such
 
 overt
 
 acts, as the execution of a bill of sale of the vessel, and a delivery of the policy, pursuant to the award, to the agent of Dearborne, they have done all in their power to inform the world, that they had no claim on either, for any demands against Dearborne.
 

 There is error also, in that part of the decree, which directs Seth Spring
 
 &
 
 Sons to
 
 account
 
 for their claims on Dearborne. The complainants have no right to an account; and the defendants being called here only to inter-plead, and having failed to establish any claim on this fund, have as little right to such an account. They cannot, at any rate, require it, in the position in which they now stand as co-defendants with Seth Spring
 
 &
 
 Sons. It is but justice to remark, that for aught that appears in the present suit, there is no reason to suspect the integrity of the assignment to Seth Spring
 
 *129
 
 & Sons ; they appear to be respectable merchants, and to have been large creditors of *Dearbome.
 

 It is the opinion of this court, that the decree of the circuit court be reversed, so far as it postponed the demand of the appellants to those of Lindsay and of Gray & Pindar, and directed them to account ; and that instead thereof, a decree must be entered in their favor, for the whole amount recovered on the policy, with interest (the money not having been brought into court), at the rate of six per cent, per annum, from the time of rendering the judgment, the complainants deducting therefrom their costs of suit. The defendants must pay their own costs.
 

 Decebe. — This cause coming on to be heard, and being argued by counsel of the respective parties : it is ordered, adjudged and decreed, that the decree of the circuit court for the district of South Carolina, in this case, be and the same is, hereby reversed and annulled : and this court, proceeding to pass such decree as the said circuit court for the district of South Carolina should have passed, doth further order and decree, that the complainants pay to the defendant, John Spring, of the firm of Seth Spring
 
 &
 
 Sons, the whole amount ef the judgment recovered against them on the policy on the ship Abigail Ann, mentioned in the pleadings in this cause, with interest, at the rate of six per centum per annum, from the time of rendering such judgment, after deducting therefrom their costs of suit, to be taxed. And it is further ordered, adjudged and decreed, that the defendants in the said circuit court, respectively, pay their own costs.