## WILDER et al. v. WATTS et al.

(District Court, D. South Carolina. May 31, 1905.)

1. EQUITABLE ASSIGNMENTS—INSURANCE POLICIES—COLLATERAL SECURITY.

   Where an alleged bankrupt before insolvency arranged to borrow money to purchase goods, under an agreement that he would have the goods insured, and assign the policies to the lenders as collateral security, and loans were made to him, the agreement operated as a valid equitable assignment of the policies, though they were not delivered when issued, nor actually assigned until after loss, when the borrower was insolvent.

2. SAME—ACTS OF BANKRUPTCY—PREFERENCES TO CREDITORS.

   Under Bankr. Act July 1, 1898, c. 541, § 67d, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449], providing that liens given or accepted in good faith, and not in contemplation of, or fraud upon, the act, and for a present consideration, shall not be affected by it, where a debtor while solvent made an equitable assignment of insurance policies to be issued as security for certain loans then made to him, but failed to make an actual

delivery and assignment of the policies to the creditor until after loss, when he was insolvent, the assignment thereof at that time did not constitute an act of bankruptcy, within Bankr. Act July 1, 1898, c. 541, § 3, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3422], as a transfer of his property while insolvent with intent to prefer certain of his creditors.

3. SAME—PETITION—AMENDMENT.

Where a proposed amendment to an involuntary bankruptcy petition seeks to plead alleged acts of bankruptcy occurring subsequently to those stated in the original petition, which must have been known to some of the original petitioners at the time such original petition was filed, and the alleged amendment is not served on the bankrupt, and no excuse is offered why the acts sought to be so pleaded were omitted from the original petition, leave to file such amendment will be denied.

In Bankruptcy.

W. R. Richey, for petitioning creditors.

Geo. S. Mower and Johnstone & Cromer, for certain respondents.

BRAWLEY, District Judge. The above-named petitioners filed their petition January 16, 1905, against J. W. Watts, doing business under the name of Clinton Brokerage Co., Bailey & Son, and the National Bank of Newberry, alleging, among other things, indebtedness to the petitioning creditors; that the stock of goods and merchandise belonging to Watts was entirely destroyed by fire on December 2, 1904, and that said Watts had two policies of insurance on his said stock of goods (one for $500, and one for $1,000), and that on the ——— day of December, after the fire aforesaid occurred, he assigned said policies of insurance (the one for $1,000 to the National Bank of Newberry; the other, for $500 to Bailey & Son); that Watts was at that time insolvent, and these transfers were with intent to hinder, delay, and defraud the petitioners. The bank and Bailey & Son each filed demurrers on the ground that the petition was multifarious, in that the charge that they had received voidable preferences was improperly incorporated in the petition to have the defendant Watts adjudged a bankrupt. Watts filed an answer in which he stated as to the alleged preference of the National Bank of Newberry that:

"When he was about to establish the Clinton Brokerage Co., and needed funds with which to buy a stock of goods, he applied to the said National Bank of Newberry for a loan for that purpose, and agreed that he would have his store fixtures and the stock of goods insured, and assign the policy of insurance, to the amount of $1,000, as collateral to secure the money advanced by the said bank; that thereupon, and in pursuance of the agreement then made, the said National Bank of Newberry lent the money, aggregating more than $1,000, that he did procure a policy of insurance to be issued, as he had agreed to do, but that he failed to make the actual transfer in writing to the said bank until in December, 1904; that, however, from the date of the issuance of the said policy of insurance he regarded it as pledged to the said bank as above set forth, and the actual transfer in writing was made in pursuance of the agreement entered into before the loan was made; and that when the said agreement was made, and when the cash advances were made to him by the said National Bank of Newberry, the respondent was not insolvent."

A similar statement was made with respect to the assignment of the insurance policy to Bailey & Son. The answer further stated

that he was engaged in successful business when his stock of goods was destroyed by fire, and that he did not intend to delay, hinder, or defraud creditors, but that the transfer of these policies was made in good faith, and in pursuance of agreements entered into before the debts were contracted. This answer was filed February 3, 1905, and, without passing upon the question raised by the demurrer, the following special order of reference was made:

"Upon reading and filing the petition in the above-stated case, and of the answer of J. E. Watts, the alleged bankrupt, it is ordered that the same be referred to Julius H. Heyward, Esq., referee, to inquire and report whether the alleged bankrupt has committed an act of bankruptcy, within the intent and meaning of the bankruptcy act, and upon said hearing the National Bank of Newberry and M. S. Bailey & Son, who have filed demurrers to said petition on the ground that the same is multifarious, shall be allowed to appear, if they be so advised; the court being of opinion that the said demurrer furnished no good reason why the inquiry herein directed should not be made."

The referee filed his report February 27, 1905, and with it the testimony which he had taken, and the facts found by him are as follows:

"That during the latter part of the month of August, A. D. 1904, the said Watts, then being about to engage in the business of buying and selling merchandise at Clinton, S. C., entered into an agreement with the National Bank of Newberry whereby the said bank agreed to advance to him cash from time to time as called for; that the said Watts agreed to give therefor, as received, his notes, indorsed by one J. D. Davenport; that the said Davenport was present when said agreement was made, and assented to the same, and it was further then agreed that the said Watts should insure his stock of goods to the amount of $1,000, and assign the policy to the bank; that about the same time a similar agreement was made by the said Watts with M. S. Bailey & Son, of Clinton, S. C., * * * that the said Watts was then presumably solvent, his indebtedness being insignificant."

He then reports that Watts begun business on September 1st, and apparently did a successful business; that on September 14, 1904, he took out a policy of insurance for $500, and on October 17th another policy for $1,000; that the entire stock of goods was destroyed by fire December 2, 1904; that after said loss by fire Watts was insolvent, having then no assets except the two claims for insurance, and a small tract of land, valued at about $50, and certain outstanding accounts, amounting to about $700; that immediately after the fire, on December 3, 1904, Watts assigned to the National Bank of Newberry the policy of insurance for $1,000, which, it seems, had been deposited with Bailey & Son before that date. The policy for $500 was in his desk, and was destroyed, and he assigned his claim for insurance on that policy to Bailey & Son. He finds as matter of law that, under section 3 of the bankruptcy act, Watts had committed an act of bankruptcy; he having transferred, while insolvent, a portion of his property to the creditors above named, with intent to prefer, etc.; he holding that, at the time the policies were transferred, Watts was insolvent. That Watts was actually insolvent on December 3, 1904, is not disputed.

The case is before me on a review of the referee's report. In support of the referee's conclusions, two cases are relied on (Wilson Brothers v. Nelson, 183 U. S. 191, 22 Sup. Ct. 74, 46 L. Ed. 147; Iron

& Supply Co. v. Rolling Mill Co., 11 Am. Bankr. Rep. 200 [D. C.] 125 Fed. 974) ; and pending the argument before me the case of Johnston, Trustee, v. Huff, Andrews & Moyler Co. (lately decided by the Court of Appeals for the Fourth Circuit) 133 Fed. 704, was referred to by him as also sustaining his conclusions. In Wilson v. Nelson the debtor in February, 1885, to secure a loan then made, gave to the creditor irrevocable power of attorney to confess judgment after maturity upon a promissory note. The creditor, November 21, 1898, entered up judgment upon the note, and warrant of attorney ; and immediately thereafter execution was issued thereon, and all of the debtor's property seized and sold. On December 10, 1898, a petition in bankruptcy was filed ; and the court held (four of the justices dissenting) that the judgment so entered, and the levy of execution thereon, was a preference "suffered" or "permitted," within the meaning of clause 3 of section 3a of the bankruptcy act of July 1, 1898, c. 541, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3422], and that the failure of the debtor to vacate and discharge it at least five days before the sale on execution was an act of bankruptcy ; the ground of the decision being that, the power of attorney being irrevocable, the debtor thereby without any further act of his, "suffered" or "permitted" judgment to be entered against him within four months, the effect of which would be to enable the creditor to whom it was given to obtain a greater percentage of his debt than other creditors, and that by his failure to vacate it or file a petition in bankruptcy he confessed that he was hopelessly insolvent, and consented to the preference that he failed to vacate.

In Iron & Supply Co. v. Rolling Mill Co., the rolling mill company had given to the national bank its note December 6, 1902, pledging a large quantity of material, consisting of pig iron, etc., as security for its payment, with the privilege of selling or using any or all of said material ; and in case of such sale it was to pay the cash in settlement of its debt to the bank, or transfer and deliver to it its equivalent in good accounts. It appeared from the evidence that the company sold or otherwise used said material ; that it did not pay any cash therefor, or on account of said note ; that on February 28, 1903, it transferred on its books a large amount of open accounts ; that, of the accounts so transferred, a large amount of them accrued prior to December 6, 1902, the date of the loan and pledge referred to—the evidence not showing which particular accounts represented any part of the material pledged. The evidence showed that on February 28th the defendant was indebted to a large amount other than to the bank, among its creditors being its operatives and employés. The contention of the defendant was that by the transfer of the accounts they took the place of the material, as an exchange of securities, and that therefore such transfer was not a preference, within the purview of the bankrupt act. But the court held that the facts wholly failed to show an exchange of securities ; that the accounts were not substituted or exchanged for the material, which had been sold with the consent of the bank, there being no agreement that it was to be sold for its benefit, and no covenant going to the bank for the proceeds thereof ; that the specific accounts rep-

resenting such proceeds were not identified, and there was no such description of them that they could be identified; that the effect of the agreement with the bank was to permit the defendant to use or sell the pledged material, and to withdraw it from the operation of the pledge, and, so far as that material was concerned, merely obligated the defendant to pay its debt to the bank with cash, or to transfer and deliver to it the equivalent in good accounts, which obligation was not performed until within four months prior to the petition in bankruptcy. The court, therefore, held that this transfer was not an exchange of one species of property for another, and at the time of such transfer the defendant was insolvent, and, being within four months preceding the bankruptcy proceedings, it gave a preference to said bank over other creditors, and was designed and calculated to have such effect.

In Johnston, Trustee, v. Huff, Andrews & Moyler Co., one White had an agreement with the Norfolk & Western Railway Company to furnish supplies and board to its employés; the railway company agreeing to deduct from the wages of the men employed by it the amount due by each of them to White, to pay that amount to him; White making out a statement each month of the amount due by each employé. White, in order to obtain money necessary to carry on his business, arranged for a credit with the Huff, Andrews & Moyler Company, and on January 30, 1902, gave them an order on the treasurer of the Norfolk & Western Railway Company for the payment of any and all moneys that "may now be due or may hereafter become due as boarding boss." There was a mutual agreement between them and White, when the order was given, that it should not be presented to the railway company, as that company objected to orders being given on it, and during the year 1902 White collected from the railway company over $13,000 for his own use. The order held by the Huff, Andrews & Moyler Company was not presented until December 26, 1902, and on December 27th White filed his petition in bankruptcy. In its opinion the court says:

"That it was the understanding and intention that the order should not put the funds payable by the railway company out of the control of White until some financial emergency arose, is perfectly obvious."

It cites Justice Swayne's opinion in Christmas v. Russell, 14 Wall. 84, 20 L. Ed. 762, that "an agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment." The court also cites Wilson v. Nelson, 183 U. S. 191, 22 Sup. Ct. 74, 46 L. Ed. 147. I sat in that case, and concurred in the opinion, but do not conceive that it supports the position of the referee here. As the court says: "It was expressly agreed that the order should not be presented, and the assignor was permitted to collect funds for nearly a year—the funds now claimed to have been assigned." The money due by the railway company to White was, as the court says, "a fund which is substantially the bankrupt's only asset." It constituted his basis of credit, and could have been reached by legal process. It was a fund which was at all times available for the payment of his debts, and, if it had been known that

it had been assigned, other creditors might have protected themselves; and the court therefore held that, as this agreement could only take effect on the day of presentation, the delay in presenting it until the day before the bankruptcy must be held to have been a transfer on that day for a pre-existing debt, and hence a preference. An analysis of the facts in the case now under consideration shows that the cases are clearly distinguishable. Here the debtor agreed to insure for the protection of his creditor, in order to obtain the money loaned. He could not have obtained the advances otherwise, and the agreement to transfer the policy of insurance was clearly an equitable assignment. This policy of insurance was not an asset on the faith of which he received other credit. There was no proof that other creditors sold him goods on the faith of the insurance policy. There was no agreement that the assignment of the policy should not be disclosed. There was no reason why other creditors should not have protected themselves in the same way. There was no agreement to hold it in suspense for the benefit of the bankrupt until the eve of filing the petition in bankruptcy. It was not an asset available for creditors until the fire, and an effective transfer of the policy could not have been made before the fire, because most of the standard forms of policy forbid an assignment before a loss. It was not an asset that could have been reached by any process by the other creditors before the fire. It was not an agreement that was prejudicial to other creditors when made.

I have reviewed these cases at greater length than I would have otherwise thought necessary, out of respect to the learned referee, to whose opinions I generally attach much weight, but they do not support the conclusions reached by him.

The bankrupt act of July 1, 1898, c. 541, § 67d, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449], provides that "liens given or accepted in good faith and not in contemplation of or fraud upon this act, and for a present consideration, * * * shall not be affected by it." The testimony supports the answer of the defendant Watts that the money was advanced to him in good faith at a time when he was solvent, to be used in his business; that there was an agreement at that time that his stock of goods was to be insured, and that the policies were to be assigned as security for the loan. There was a present consideration, and an agreement to assign the policies, which, on principle and on authority, created an equitable lien upon the money due on the policies of insurance. Chief Justice McIver, in Swearingen v. Ins. Co., 52 S. C. 315, 29 S. E. 722, says:

"While a policy of insurance is purely a personal contract between the insurer and the assured, and hence the mortgagee of the premises insured, merely as such, has no interest, either in law or equity, in a policy of insurance taken out by the mortgagor in his own name and for his own benefit, yet if the mortgagor is bound, either by covenant in the mortgage or otherwise—for example, by a valid verbal agreement—to keep the property insured, as a further security for the payment of the mortgage debt, then the mortgagee is entitled to an equitable lien upon the money due on the policy of insurance, even though taken out in the name of the mortgagor. * * * This rule is recognized in Wheeler v. Ins. Co., 101 U. S., at page 442, 25 L. Ed. 1055, where Mr. Justice Bradley thus tersely states it: 'If the mortgagor

is bound by covenant or otherwise to insure the mortgaged premises for the better security of the mortgagee, the latter will have an equitable lien upon the money due on the policy taken out by the mortgagor, to the extent of the mortgagee's interest in the property destroyed.'"

The subject is fully discussed in Ketchum v. St. Louis, 101 U. S. 306, 25 L. Ed. 999; Fourth St. Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855; Walker v. Brown, 165 U. S. 664, 17 Sup. Ct. 453, 41 L. Ed. 865; and the general doctrine is that where a party by express agreement sufficiently indicates an intention to make some particular property, real or personal, or fund, a security for a debt or other obligation, and promises to assign or transfer the property as security, equity, regarding that as done which ought to be done, creates an equitable lien upon the property indicated; or, in the words of the case last cited:

"To dedicate property to a particular purpose—to provide that a specified creditor, and that creditor alone, shall be authorized to seek payment of his debt from the property or its value—is unmistakably to create an equitable lien."

Loveland, in his work on Bankruptcy, p. 600, says:

"Liens may be divided into three classes:. First, common-law or retaining liens; second, liens created by statute, such as mechanics' liens; third, equitable liens." "The term 'lien,'" says he, "is especially applicable to the common-law lien; but it is by analogy generally applied to other cases, where a right to prepayment exists out of a particular property, or a particular asset or interest in property, either by contract, expressed or implied, or by the implication of a trust or statute, although the property itself may not be in the possession of or vested in the person claiming the lien. Liens of this description are in the nature of equitable charges."

The fact that the policies of insurance were not actually delivered to the creditors is of no consequence here. A case might arise in which delay or nondelivery might be important as evidence upon the question of a complete execution of the agreement for a lien, but the testimony shows beyond dispute the agreement for a lien; and equity, which regards the true intention of the transaction, will consider what was actually done as sufficient if the parties themselves treated it as a sufficient performance of that part of the agreement. "Actual delivery of the policies and continuous possession by the transferee are not indispensable to create and preserve such lien as is now being considered." Spring v. Ins. Co., 8 Wheat. 268, 5 L. Ed. 614. As most of the standard forms of policies inhibit their assignment before a loss, the actual manual delivery of the policy after the loss suffices. The creditors in this case, upon the testimony here, could have compelled the delivery of the policies.

Archbald, District Judge, in Re Charles W. Busby, 10 Am. Bankr. Rep. 650, 124 Fed. 469, says:

"At the time the debt is created the creditor has the right to dictate the terms on which he will part with his money or property, and may therefore demand that he shall first be secured to such an extent as satisfies him. With this the bankruptcy law does not undertake to interfere, the creditor being allowed to retain without question whatever advantage he has acquired thereby."

Section 57e–h, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443].

As to the life insurance policy which was assigned to the bank by the insurer, it stands as a secured, and not a preferred, matter.

The policy of insurance is a mere personal contract between the assured and the underwriters to indemnify the former against any loss he may sustain through the destruction of the insured property. It is a chose in action, and an interest in the proceeds may be assigned by parol as well as by deed. No rights to the benefit of the policy attach in favor of either mortgagees or creditors in the absence of a trust or contract to that effect, and an equitable lien arises in favor either of mortgagee or creditor when the assured enters into a contract in any form that the proceeds shall be so applied, provided no valid objection to the transaction is raised by the insured.

The case of McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554, is nearer in its facts to the case at bar than any which has been brought to my attention. In that case a corporation procured a loan from a bank under a parol agreement by which the mortgagee was to become surety therefor, and the mortgage, together with the insurance on the mortgaged property, which was payable to the mortgagee, was to be given as collateral security; the policies of insurance being in the hands of the agent from whom they were procured. The court says:

"The evidence of the parol agreement makes clear what otherwise might be doubtful—the intention of the parties. Such parol evidence is admissible to explain the meaning of indefinite terms. The advances had been wholly obtained under, and upon the faith of, the parol agreement. The note was given upon the closing up of the matter, and, read in the light of the parol agreement, clearly discloses the intention of the parties. It declares that the insurance, if fire should occur, should stand as security for the payment. We cannot consider this agreement as a common-law pledge, and void because the policies were not given into the possession of Daskam or the bank. It was not a pledge of marketable security or a salable property. Whether we consider the verbal arrangement or the written note, it was an agreement for a beneficial interest in a chose in action—a personal contract between the insurer and the insured. Under the modern rule, such an equitable interest may be created by parol as well as by deed. The transaction, in equity, amounts to an appropriation of any claim under the policies for any loss by fire which may occur."

In that case the bankrupt, subsequent to this parol agreement, and a few days before the fire, caused to be indorsed upon two of the policies, "Loss payable to R. W. Roberts as the interest may appear;" Roberts being at that time a creditor of the bankrupt. In considering his claim the court says:

"Assuming Mr. Roberts to have had no knowledge of the equitable rights of the bank and of Daskam upon this insurance, over and above the amount of the mortgage debt, it still remains that Mr. Roberts parted with nothing upon the faith of this security, and gave no indulgence with respect to the debt upon the faith of the transfer. His equity, therefore, cannot outrank the equitable lien of Daskam and the bank. He simply stands, as respects this insurance, in the shoes of the bankrupt; taking that to which the bankrupt would have been entitled in a case of loss, after payment of the debts theretofore secured upon this insurance."

This opinion of a court of high authority—Judges Jenkins, Grosscup, and Baker—is entitled to great weight.

As the testimony shows clearly that the National Bank of Newberry and Bailey & Son have equitable liens upon the insurance

138 F.—28

money, and that the respondent, Watts, has committed no act of bankruptcy in the transfers, the decision of the referee is reversed.

There remains another question to be considered. It appears that at the references held by the referee some testimony was brought out that subsequent to the fire Watts collected some accounts that were due him, to the amount of about $700, which was paid out by him, as far as it would go, to such of his creditors as held claims falling due; leaving outstanding a large amount of claims unpaid. The referee holds that Watts, being then insolvent, committed an act of bankruptcy, under section 3, subd. "a" (2) of the statute (30 Stat. 546 [U. S. Comp. St. 1901, p. 2422]). These alleged preferential payments were not stated in the petition as acts of bankruptcy. In fact, as it subsequently appears, one of the payments was made to one of the petitioners. The referee was of opinion that the order of reference required him to take cognizance of any evidence tending to show that any act of bankruptcy had been committed. Such was not the intention of the order, nor could such order have fairly been made. The order was, in terms, stated to be a "special order of reference." It referred the petition and the answer of Watts to the referee, "to inquire and report whether the alleged bankrupt has committed an act of bankruptcy, within the intent and meaning of the bankruptcy act. The only act of bankruptcy alleged in the petition, and to which the respondent, Watts, answered, was the transfer of the insurance policies, and the testimony should have been confined to the special issue raised by the pleadings. The petition alleged but one act of bankruptcy, and the respondent, in his answer, responded to the issue which the petitioners made. It was his right to be advised as to the charges made against him, and he cannot be justly adjudged a bankrupt on account of acts which were not charged against him. Non constat but he may have had a sufficient answer or explanation of the acts referred to.

In aid of the referee's conclusion that Watts committed an act of bankruptcy in the preferential payments, the attorneys for the petitioner, pending the hearing before me, asked leave to amend their petition so as to charge these alleged preferential payments as acts of bankruptcy. Amendments are usually allowed if the ends of justice will be promoted, but, as they are not matters of right, the court must exercise its discretion in permitting them. As an adjudication in involuntary proceedings puts a stigma upon the person so adjudicated, he ought, in fairness, to have opportunity of answering; and the proposed amendment, duly verified, should have been served upon him. This was not done. The amendment proposed states a new and independent cause of bankruptcy, not related to the original petition. The petitioners have given no reason why this alleged act of bankruptcy was not stated in their first petition. They cannot claim ignorance, because one of the alleged preferential payments now stated as an act of bankruptcy was made to parties who filed the original petition. There are respectable authorities holding that acts of bankruptcy occurring subsequent to those stated in the original petition cannot be allowed to be

brought in by amendment. The Circuit Court of Appeals of the Second Circuit, in Re Sears, 117 Fed. 294, 54 C. C. A. 532, says:

"The order allowing an amendment of the petition by the insertion of a special act of bankruptcy was erroneous, because it clearly appeared that such act of bankruptcy was not an earlier act than that first alleged, but was later."

That appears to have been the case here, for the transfers of the policies of insurance were made on December 3, 1904, and the alleged preferential payments were made after that date. The court, in the Case of Sears, holds that the provision for amendments in general order No. 6 (89 Fed. v; 32 C. C. A. ix), by implication limits the power of amendment to the single case in which an earlier act of bankruptcy is sought to be incorporated into the petition. The general rule stated by Collier, Loveland, and other writers on the bankruptcy act is that:

"Bankruptcy courts have the usual powers of courts of justice, upon motion and for good cause, to authorize amendment of pleadings, including petition. They will rarely do so if the purpose of amendment is to introduce allegations setting up an additional or new act of bankruptcy, but such an amendment will be allowed if clearly in furtherance of justice, and if its omission from the original petition is properly excused."

It does not appear to me that the proposed amendment is "clearly in furtherance of justice." The petitioners have not shown any good reason, or any reason at all, why the acts of bankruptcy set up were omitted from the original petition, and have made no excuse for such omission; and, as it appears from the whole case that the alleged bankrupt has no assets to be administered, I fail to see how the interest of creditors can be served by harassing him with further proceedings.

The report of the referee is set aside, and the petition dismissed.