In re DUNCAN.

Ex parte ELLIOTT.

(District Court, D. South Carolina. August 9, 1906.)

BANKRUPTCY—PROPERTY VESTING IN TRUSTEE—NOTE TRANSFERRED AFTER FILING OF PETITION.

A debtor, 10 days before the filing of a petition in bankruptcy against him, through his attorney offered a note of a third party as collateral security to a bank, which held his own unmatured notes on condition that the bank would agree to extend his notes. The president of the bank answered that he would consider the proposition and would make some investigation as to the value of the collateral, and the attorney left, retaining the note in his possession. A month later, and after the filing of the petition, he was notified of the acceptance of the offer and delivered the note to the bank. Held, that until the acceptance there was no contract which passed title to the note, and that such title, being in the bankrupt at the time of the filing of the petition, could not thereafter be transferred by him, but on his adjudication vested in his trustee.

In Bankruptcy.

Miller & Whaley, for Wm. Elliott, Jr., trustee.
Buist & Buist, for South Carolina Loan & Trust Co.

BRAWLEY, District Judge. The petition of William Elliott, trustee of the above-named bankrupt, asks that the South Carolina Loan & Trust Company be required to surrender to him as a part of the bankrupt's estate a note for $10,000 of the Union Manufacturing & Power Company, dated December 3; 1905, payable to the order of Thomas C. Duncan, and pledged to said loan and trust company as collateral security subsequent to November 13, 1905, when the petition in bankruptcy was filed, and the case comes up upon the rule to show cause and return thereto. Testimony has been heard thereon, and arguments submitted, and after consideration I find the following facts:

Thomas C. Duncan was the president of the Union Manufacturing & Power Company, and was the owner and holder of sundry notes of said corporation, among others of a note for $36,519.88, dated November 3, 1905, payable to the order of said Duncan, 30 days from date,

with interest at 7 per cent. He had been president of the Union Cotton Mills and of the Buffalo Mills, which in the early autumn of 1905 were heavily involved in financial difficulties, culminating in the bankruptcy of the Union Mills and the reorganization of said mills and its affiliated companies. Duncan was also heavily involved personally, and employed J. P. K. Bryan, Esq., as counsel to assist him in arranging with his personal creditors, doubtless apprehending that the impending bankruptcy of the Union Mills, against which a petition in bankruptcy had been filed October 3, 1905, would involve him in like proceedings. Among his personal creditors was the South Carolina Loan & Trust Company. which held two notes of $5,000 each, secured by shares in the Union Cotton Mills, and the president of that company wished additional security. As the result of these negotiations the above-described note was turned over to the company December 5, 1905. A petition in involuntary bankruptcy was filed against Duncan November 13, 1905, and he was adjudged a bankrupt January 30, 1906. The petitioner claims as trustee that, inasmuch as the said note was delivered to the bank subsequent to the date when the petition in bankruptcy was filed, it is a part of the bankrupt's estate to be administered by him in due course, while the bank claims title to the note as the result of the negotiations which will now be considered in detail.

In support of its title it presents a letter of date November 5, 1905, written by T. C. Duncan and addressed to it as follows:

"Pursuant to our recent conference I beg to say that I hold for you as collateral to my two notes, which you hold, the note of the Union Manufacturing & Power Company for $10,000.00, which is adequate security for you."

Mr. Duncan testifies that this letter, purporting to have been written at Union, S. C., on the date mentioned, was actually written in Mr. Bryan's law office in this city, and that at that date he did not hold any note of the Union Manufacturing & Power Company for $10,000, but that, as he held a note for $36,519.88, he had power as president of that company to divide the note, and that he prepared a note for $10,000, which he left with Mr. Bryan, his attorney, as the form of a note which he was willing to deliver to the South Carolina Loan & Trust Company, if as the result of the negotiations between Mr. Bryan and that company it would agree to accept the same, and that the note for $10,000 actually delivered was not executed until December 3, 1905. when the note of $36,519.88. which was payable within 30 days, was due, and when the power company executed two notes, one for $10,000 and the other for something over $26,000 were taken in exchange. Mr. Bryan testifies that he took the note for $10,000, which Duncan refers to, to the president of the South Carolina Loan & Trust Company on or about November 5, 1905. This note was dated November 3d. It was offered to Mr. Ficken, president, as collateral for Mr. Duncan's notes above referred to; Mr. Bryan's object being to obtain from the loan and trust company forbearance on its part from pressing its claims against Duncan. Mr. Ficken, president of the company, told him that he would consider the proposition and would make some investigation as to the value of the note offered as col-

148 F.—30

lateral, and Mr. Bryan left with him a copy of the note proposed to be offered, and it appears that he heard nothing further from Mr. Ficken until on or about December 5th, when Mr. Ficken sent to him for the note, and the same was delivered to the bank. Mr. Bryan's testimony is that he held the note of November 3, 1905, until the substituted note of December 3, 1905, was sent to him, when the first-mentioned note was destroyed, and that at any time during the month of November he would have delivered it to the loan and trust company if said company had notified him of the acceptance of Mr. Duncan's offer, but that no such notice was received by him prior to December 5th. Mr. Ficken's testimony, as stated in his letter of April 7, 1906, which has been accepted in evidence, is that his bank held two notes of Mr. Duncan for $5,000 each, dated August 10, and August 21, 1905, each for four months, which were renewals of former notes given for money loaned, and that the bank held 90 shares of Union Cotton Mills stock as collateral for these notes. In this letter he says:

"When the mills got into trouble recently, and the stock depreciated in value, Mr. Duncan, evidently to avoid being pressed for payment of the notes at their maturity, applied in advance for a further extension of time, offering to put up additional collateral. For obvious reasons we readily consented to grant the desired extension, provided the collateral offered proved satisfactory. Shortly afterwards Mr. J. P. K. Bryan, the legal adviser of Mr. Duncan, notified us that Mr. Duncan had deposited with him as additional collateral for Mr. Duncan's above-mentioned indebtedness to our bank a $10,000.00 note of the Union Manufacturing & Power Company, dated 3d of November, 1905, payable at 30 days. Confirming this, Mr. Duncan wrote to this bank under the date of the 5th of November, 1905, stating that he had set aside the last-described note to be held as collateral security for his above-mentioned indebtedness. We took the matter up promptly and instituted inquiries as to the financial responsibility of the said power company. Having become satisfied with the collateral note, we accepted Mr. Duncan's previous disposition thereof in our favor. This collateral note matured and was renewed whilst in Mr. Bryan's custody. The renewed note was for 90 days and was not actually delivered to our bank until the 5th of December, 1905. We still hold it as collateral security."

Mr. Ficken further testifies that Mr. Bryan at the interview stated that Duncan was perfectly solvent and would furnish additional satisfactory collateral security, if the indulgence desired was granted. The note in controversy was not issued until December 3, 1905, at which date the previous note of $36,519.88 matured, and this note for $10,000 and another for $26,732.91, which has been turned over to the trustee in bankruptcy, were issued in renewal. The note of $10,000 left with Mr. Bryan and offered to Mr. Ficken does not appear on the books of the power company, and Duncan testifies that this note was intended by him only as the form of a note to be given to the trust company; but, assuming that Mr. Duncan is mistaken, and this note was a legal obligation of the power company, and the note of December 3d merely a substitution of one note for another, we come to the decisive question in the case, and that is, whether there was a valid binding transfer of this note prior to November 13, 1905. If Mr. Duncan's letter of November 5th stood alone, and the transaction was otherwise unimpeachable, it would seem to be such an unconditional setting apart

of a security as would confer upon the trust company at least an equitable title to the note; but this letter was manifestly intended to be a part of the negotiation which Mr. Bryan, as attorney and agent, was to have with Mr. Ficken, and was delivered at the same time these negotiations were undertaken. In point of fact Mr. Duncan did not hold the note as the letter states. It was in the hands of Mr. Bryan, not for the purpose of being delivered unconditionally to the trust company, but was offered to it upon terms; that is, Mr. Bryan agreed to give up this note as additional security, provided Mr. Ficken would agree to an extension of time and forbearance. Mr Bryan was called as a witness by the trust company, and the substance of these negotiations, as given in his testimony, is:

"When I made the tender to Mr. Ficken of the note dated November 3, 1905, and delivered to him the letter of Mr. Duncan dated November 5, 1905, that offer of further security was made with the view of and the understanding that if he accepted the security the bank would extend time and forbear; but Mr. Ficken never did say to me that he would forbear, but it was understood between us that if he accepted the security that he would forbear, because it was a part of the original proposition. If Mr. Ficken had accepted it on that day then and there taking the note, he would have been bound to forbear under the terms of the agreement. That was the whole object and purpose of offering the security when we did."

Being asked the question:

"So far as you know he never communicated with you his determination to accept the security on those terms?"

—his answer was:

"He never called for it until after December 3d. That is my knowledge, but what he himself thought about it I cannot say. I can only tell you what I did."

Another question and answer are as follows:

"Q. Mr. Ficken did not, when you visited him, accept the proposition you made? A. He simply said: 'I will consider it.' His phrase was, 'I will investigate it. I will investigate the note'; that is, what the note represented."

And, further on in his testimony, he says:

"I held that note for him when he called for it. That was my idea of it. But as to when he made up his mind, or when he determined to call for it, I can't say. That is a matter which Mr. Ficken will have to answer."

The fact is Mr. Ficken did not call for the note until December 5th, and at no time did he notify Mr. Bryan or Mr. Duncan that he accepted their proposition. During the time he was considering the proposition he took no steps, so far as appears, towards collecting the note.

If the trust company is entitled to the note, it must be by virtue of a contract. Now, on what date was such a contract made? It was certainly not on November 5th, for neither of the two witnesses for the trust company, Messrs. Ficken and Bryan, testify that a contract was made on that date. The essential features of a contract are lacking; that is, an agreement of two minds. Mr. Duncan, personally, had no negotiations or communications with the trust company after

that date, and Mr. Bryan, as his agent and representative, simply made an offer which was not on that date accepted. Nor is there any evidence of any agreement on the part of Mr. Ficken to accept the offer until December 5th, several weeks after the petition in bankruptcy was filed.

It cannot be pretended that Mr. Ficken was bound as the result of the negotiations of November 5th. He was free at any time after that date to take any steps that he might be advised towards the collection of his note. All that he agreed to do was to investigate the nature of the collateral offered. He had Mr. Bryan's assurance that Mr. Duncan was perfectly solvent and able to furnish satisfactory collateral. He was in Charleston; the power company, whose note was offered, was in Union. Its solvency, to say the least, was doubtful, and Mr. Ficken took time to consider whether he would accept the collateral offered. He was not bound by any contract to accept the collateral or to forbear the exercise of any of his rights. If he was not bound, Duncan was not bound. He had made an offer, it was not accepted, and he was free to withdraw it. Fair dealing would have required him to give notice to Mr. Ficken of his withdrawal of the offer, so, Mr. Ficken, in fairness, should have notified Mr. Duncan of his refusal of the offer before taking any further steps to enforce the payment of the note; but I am unable to find in these negotiations the essential elements of any binding contract, and must conclude, therefore, that on and prior to November 13, 1905, the title to the note in question was in Duncan, and not in the trust company. If that conclusion is correct, did the transfer of the note by Mr. Bryan to the trust company on December 5, 1905, confer a good title?

By the terms of the bankruptcy act the trustee is vested by operation of law with title of the bankrupt to all property of which he was in possession as of the date on which he is adjudged a bankrupt. The filing of a petition against him is a caveat to all the world, and all persons dealing with him during the interval from that date to the date of final adjudication do so at their peril. The property of the bankrupt, after the filing of the petition against him and before adjudication thereon, is in custodio legis. It is subject to the prehensory power of the court, and the person against whom such petition has been filed cannot make any legal disposition of it. No creditor can lay hands on it, and no court, state or federal, can attach it. It is under the sole and exclusive jurisdiction and control of the bankruptcy court, and, if such court adjudges the party a bankrupt on the petition, the title to his property vests in the trustee as of the date of the filing of the petition; that date being the point of cleavage.

The learned counsel for the trust company insists that the fact that the bankrupt, in his schedules, has set forth this note as collateral held by the trust company to secure its indebtedness, is an admission of its title. These schedules were filed some time after the note in question had been actually delivered to the trust company, and as a simple statement of fact it is true that the trust company holds the note as collateral. Whether such holding is legal is the very point at issue. Certainly its title is not good, if it rests upon anything done by Duncan

or his agent after November 13th. From that date he was as to all of his property civiliter mortuus. He could make no disposition of it to the prejudice of his creditors save through the sanction of the court of bankruptcy, and any transfer of property made after that date would be simply void. Any such transfers within four months of the date of the filing of the petition would be invalid, if the person receiving it had reasonable cause to believe that the party making it was insolvent, and, although it might be fairly claimed by the trust company that on November 5, 1905, it had no reasonable cause to believe that Duncan was insolvent, such claim could scarcely be made on December 5th, after a petition in bankruptcy had been filed against him.

The case of Wilder v. Watts (D. C.) 138 Fed. 426, is cited in support of the contention of the trust company. There the bank had advanced to a country merchant solvent at the time moneys to be laid out in the purchase of a stock of merchandise under a contract that the same was to be insured and the policy assigned as collateral to his note. The goods were insured and the policy taken out and lodged for safekeeping in the safe of a neighboring store. It was not delivered or assigned to the bank until after the fire as the result of which the merchant became insolvent. Certain creditors filed a petition alleging that the transfer was a preference and an act of bankruptcy, and it was held that the bank was entitled under its contract to the policy of insurance, that the mere manual possession of it was not necessary, that it had an equitable lien on it which the bankrupt act was not intended to disturb. The other cases cited rest upon the same principle, and under it the title of the trust company would be protected, if the testimony showed clearly that at any time anterior to November 13th it had agreed to accept the security proffered, and thus perfected its title; but the facts as found are that it was still considering and investigating the value of the collateral offered at the time when the petition was filed, and was at full liberty to reject it. It had no title to it until it had agreed to accept it upon the terms upon which it was offered. At the time when it did accept, December 5, 1905, it was too late. The title to the note was no longer in Duncan, all of whose property was then under the control of the court of bankruptcy subject to the law which requires that it be distributed equally among all the creditors.

It is therefore adjudged that the trustee is entitled to the possession of the note.