THE FIRST NATIONAL BANK OF MACON, plaintiff in error, *vs.* CHARLES NELSON & CO., defendants in error.

1. An agent for the sale of goods cannot, as against the owner, pledge or mortgage them to a third party, to secure advances made on his own account.

2. To constitute a pledge or pawn, under the Code, there must be a *deposit* of the thing pawned, and this cannot be dispensed with by a written agreement, that the party making the pledge will be the bailee of the pawnee.

3. When, in the submission of the law and the facts of a case to the Judge, it was agreed that if the Judge should have any doubts upon a question of fact, he should submit it to a special jury, and on the trial there arose a question of notice to a bank, and it was proven that the fact was advertised in two daily papers taken at the bank, was known to one of its directors, published in a large printed card and circulated among the business men of the community, and painted in large letters on the walls of the store in which the goods, about which the dispute arose, were kept:

*Held*, That although the cashier and president of the bank, and one of the clerks, denied the notice, as witnesses, the Judge might well fail to have such doubts as would require him to call in the jury.

Equity. Pledges. Notice. Tried by Judge COLE. Bibb Superior Court. May Term, 1868.

Megrath & Patterson were grocers and commission-merchants, on Poplar street, Macon, Georgia. On the 10th of December, 1867, they mortgaged to one Holmes, all their stock of goods, wares and merchandize, and their choses in action, to secure about $10,000 00, due by them to said Holmes. This mortgage was not recorded till the 4th of January, 1868. It was foreclosed, and a levy of the mortgage was made upon the stock in store, including certain whiskey and bacon, on which The First National Bank of Macon had a claim. Its claim was as follows: On the 2d of December, 1867, it advanced to Megrath & Patterson, $1,000 00, on twenty-five barrels of whiskey, and took from them a paper, as follows:

"$1,000 00.

MACON, GA., December 2, 1867.

Received from The First National Bank of Macon, one thousand dollars, as advance by it, on twenty-five barrels whiskey, marked "E," now stored in our store, on Poplar street, which whiskey we hereby place in its control and possession, to be used by said bank as its own property, for its reimbursement of said amount, with interest, insurance, and all other expenses thereon, should we fail to pay the same when due, to-wit: on the 1-4 day of January, 1868, but if paid when due, or before said whiskey is disposed of by said bank, for its reimbursement as aforesaid, then the said whiskey to be returned to us.

MEGRATH & PATTERSON."

The bank made other advances to them, on whiskey, as follows: In December, 1867, on the 14th, $1,300 00, on fifteen barrels; on the 23d, $3,000 00, on twelve barrels (and twelve casks of bacon); on the 24th, $1,000 00, on ten barrels, and on the 28th, $2,120 00, on thirty-five barrels. These advances were each evidenced by a receipt, a *fac simile* of the one above quoted, *mutatis mutandis*. When they were made, the bank officers were ignorant of the existence of said mortgage. Megrath & Patterson were instructed, by the

bank's agent, to set said whiskey and bacon apart, as the property of the bank, and it is believed that this was done. But Megrath & Patterson sold thirty-one barrels of said whiskey, and all of said bacon, to-wit: $4,500 00 worth, and paid no part of the proceeds to the bank. Megrath & Patterson were failing, their store was in the sheriff's hands, and there was reason to apprehend that they would depart the realm without reimbursing the bank.

Under this state of facts, set forth in its bill, the bank prayed that Holmes's *fi. fa.* should be enjoined from selling said whiskey, that the unsold whiskey, as also the proceeds of that sold, if it could be traced, should be given to the bank, and that Megrath & Patterson should give bond and security for the eventual condemnation money, in the cause, etc. The Judge granted the injunction, and required the security. Holmes made no fight with the bank. But Charles Nelson & Co., of Nashville, Tennessee, came into Court, and filed their petition to be made parties to the litigation, for the following reasons stated by them : They were largely engaged in manufacturing whiskey, and had made Megrath & Patterson their special agents for the sale of it. This agency had lasted for eighteen months, and Megrath & Patterson had sold a great deal of whiskey for them. Their authority, as agents, was special and limited, they were to sell for cash only, and had no authority to pledge, pawn, or mortgage it, or in any way to use it in their business. Their only right was to sell for cash, deduct five *per cent.* for commissions, and remit the balance to them. Since the first of November, 1867, they had sent Megrath & Patterson one hundred and thirty-two barrels of whiskey, and they had accounted for none of it; the ninety-seven barrels claimed by the bank, are of these one hundred and thirty-two. Megrath & Patterson had published their agency in the gazettes of Macon, and had emblazoned it in large and conspicuous signs upon their store-house, and Charles Nelson & Co. were persuaded that the bank's officers were cognizant of the agency before the advances were made. If they did not know it, their ignorance proceeded from carelessness. From the anomalous

style of receipt taken, from the facts that Megrath & Patterson never had ninety-seven barrels of whiskey in store at any time in December, 1867, and that, of the barrels in controversy, forty-three did not reach Megrath & Patterson till the 26th of said December, and because the prices fixed were not over two-thirds of the value of the whiskey, etc., they charged that the bank never relied upon the whiskey as a pawn or pledge. The bank never undertook to control any of it till said levy was made, but, on the contrary, the whiskey remained in the exclusive possession of Megrath & Patterson, and with the knowledge of said officers, they sold said whiskey, just as if said advances had not been made. The sixty-seven barrels of whiskey in the sheriff's hands, are worth $4,800 00, which amount Megrath & Patterson owe them. For these reasons, they prayed that they should have this whiskey, or its proceeds. Charles Nelson & Co. became parties, and the whiskey was put into the possession of a Receiver. They and the bank then agreed that the Judge should try the cause, without a jury; that his decision of facts and law should be subject to exception by either party, and that if he had doubt as to any fact, material to the decision, he (or the Supreme Court, if it went there), should direct an issue made up, and submitted to a special jury. Holmes and Megrath & Patterson consented to this, Holmes disclaiming any right to the whiskey. The decision was to be final, unless excepted to as aforesaid.

On the trial, the bank introduced, as evidence, their said receipts from Megrath & Patterson, and each party examined several witnesses.

It was shown that this whiskey was part of that sent to Megrath & Patterson by Chas. Nelson & Co., and that the bank had charged one and a half *per cent.* per month on said advances, one *per cent.* being, as the witness said, for the advance, and the half *per cent.* for interest. Charles Nelson & Co. contended that even if the whiskey had been pawned to the bank, Megrath & Patterson had no right to pledge it, and if they undertook to pledge it, the contract was void, because the bank took usury for its money.

The whiskey pledged was never separated from the balance of the stock, but was treated in every way as if it had not been pledged.  The bank officers, however, testified that they expected Megrath & Patterson to set it apart, and hold it as the bank's property, and subject to its order.  Plant, the president of the bank, was in Megrath & Patterson's store when the officer came to make the levy ; Patterson, pointing to a lot of sixty-six barrels of whiskey, said to Plant, " that is your whiskey," and to the officer, ·" you can not levy on that, it belongs to the bank;" Patterson said something about a consignment, and when Plant asked. what he meant by consignment, he replied, " from a man in Nashville, I can fix that with him."  The main controversy was as to whether the bank had notice that Megrath & Patterson were the agents of Charles Nelson & Co., for the sale of their whiskey. On this point Plant testified, that he had been in Megrath & Patterson's store several times, but had never noticed any sign of their being agents, and that he took the city papers, but had not noticed their advertisement therein, and denied any knowledge of their said agency.  The cashier of the bank testified, that he had noticed on their sign at the store, " Nelson & Co.'s copper-distilled whiskey," but not that they were agents for its sale, and that he had seen their advertisement, but did not take notice of it, nor have any knowledge of such agency.  The collecting clerk of the bank also testified to his ignorance of such agency.  Chas. Nelson & Co. produced the following evidence to charge the bank with such notice.  Patterson said he thought the bank officers knew it, because.Megrath & Patterson advertised it in the city papers, in hand-bills and circulars, and in large letters in their sign, on the side of the store, put up about the first of November, 1867 ; because their agency was generally known throughout the city, and because Mr. Ross was one of the bank's directors, and a member of the firm of J. B. Ross & Son, which firm knew of said agency.  (It was shewn that Ross, the director, was absent from Macon when these advances were made, and knew nothing of them, and that the business of

the bank was conducted by the president, etc., and the directors gave no attention to such matters as this.)

Several merchants of Macon testified, that they knew of such agency, (one said he had known it for two years,) that the sign and their advertisements so denominated them, and that it was generally known among wholesale whiskey dealers in Macon.

A letter, written by Megrath & Patterson, was on commercial note paper, three sides of which contained a printed advertisement of their business. On the first page, in a conspicuous place, was "*Agents for* Chas. Nelson & Co.'s *Copper-distilled Whiskies.*" Its date was the 19th of February, 1867. The words on the sign were not shewn. In a long and conspicuous advertisement in the daily city papers, they said: "*We are sole agents for* Chas. Nelson's *celebrated Copper-distilled* Whiskies."

The Judge held that no title to said whiskey passed from Megrath & Patterson to the bank under the contracts and facts aforesaid ; that the bank could not hold the whiskey as a pawn against Chas. Nelson & Co., because there was no delivery to the bank, and because the bank had constructive notice of the said agency. But before any order was taken, the bank's solicitors called his attention to the clause in the agreement as to doubts, and asked him to submit the question of notice to a special jury. The Judge declined doing so, saying that he would have so to charge a jury as that their finding must be the same as his own.

Thereupon the solicitors of the bank excepted, and assign as error his decision, and the reasons given for it, and his refusal to submit the question of notice to a jury.

LANIER & ANDERSON, for plaintiff in error, said, a principal is bound, if his commission merchant pledge his goods to one ignorant of the agency. It was not so in England, till 1823. But it is so here. 23 *Ga. R.*, 90. Irwin's R. Code, secs. 1944, 2111, 2179. 2 Story on Con., sec. 717. 2 Story on Agency, note to sec. 113. 11th Howard's R., 225. *Eastman vs. McAlpin*, 1 *Kelly*, (*Ga. R.*) 157. Duane on

Statutes, 579.  3 *Kelly*, (*Ga. R.*,) 146.  7 M. & W., 196. 8 Bingh., 394.  As to delivery, they cited  2 Kent, (note,) 578.   14 Pick. R.   34 *Ga. R.*, 222.   2 Story on Con., sec. 719.   37 N. H. Rep., 428.   7 Ohio R., 194.   11 Metcalf, 493.  As to notice, they cited  Jones vs. Smith, 23 Eng. Chan. Rep., (1 Hare,) 55.   Greenleaf on Ev., sec. 216. *Fleming vs. Townsend,* 6 *Ga. R.*, 111.   *Jordan vs. Pollock,* 14 *Ga. R.*, 158.  Aug. & Ames on Corp., 247 and 248, chap. 9.  As to the character of Megrath & Patterson's agency, they cited Story on Agency, secs. 17, 18, 19.  Irwin's R. Code, sec. 2170.  As to the usury, they said the Judge below did not pass on it, and, therefore, this Court ought not, but said, also, that sec. 1478 of our Code applied only to banks of this *State*, and no such penalty attached to National Banks.  See Acts of Congress, June 3d, 1864, sec. 30.

JAMES JACKSON and HARRIS & HUNTER, for defendant in error, submitted the following points:

Megrath & Patterson, as factors, had no right to pawn or pledge these goods; 1 Parson, 50, note G; Story on Agency, 224, 447; 2 Strange, 1178; 3 Atkins, 52; 6 East, 537; 7 East, 4; 15 East, 41; 4 Burrows, 2046; 11 Howard, 224; 2 Mass., 398; 13 Mass., 181; 23 *Ga.*, 205.  The instruments sued on by the bank are not mortgages.  Code, 1944, 1945.  They cannot be construed to be sales, because no price was agreed upon, and were not valid, even as pawns, because of no actual delivery, but if anything, in the way of valid security for money borrowed, this is their character, and, as such, no title passed to the bank against the true owner.  Code, 2110, 2111, 2112, 2113, 2114, 2597; 1 Amer. Lead. Cases, 668, 662; 11 Howard, 226.  It makes no difference whether the bank had or had not notice of the consignment.  1 Maule & Selwin, 140, 493; 5 Vesey, 213; Code, 2111.  Nor does section 2179 of our Code, alter the common law in this respect.  Repeal by implication.  Sedgwick on Statute and Com. Law, 127; 5 Hill, 221; 2 Barb., 316; 6 Cushing, 465.  If 2179 be construed to apply to factors pledging goods on consignment, not only is it forcing

The First National Bank of Macon *vs.* Nelson & Co.

the statute beyond necessary implication, in repealing the common law principle, but it makes it conflict directly with section 2111 of the Code, and makes 2111 conflict with 2597. If construed to apply to purchasers, and not to pawnees in the case of factors, the entire Code harmonises, and all its provisions must be construed in "*pari materia,*" and be reconciled if possible. 15 *Ga.*, 361. Sedgwick, on Stat. and Com. Law, 127. Notice to the cashier is notice to the bank. 17 *Ga.*, 99. The President could have seen the placard. The facts constituted, in law, notice. 14 *Ga.*, *Ga.*, 158. Constructive notice is enough for this case; for 2179, of the Code, does not read "having *actual* notice," but "having notice"; any sort of notice. 23 *Ga.*, 203 ; 25 *Ga.*, 277 ; 26 *Ga.*, 138 ; U. S. Stat., 1863, 1865, 102d page, *et seq.* These contracts of the bank are wholly void, because of the usury Act of June, 1864, secs. 30 and 53. It cannot, at law or in equity, collect these contracts. U. S. Stat. at Large, 1863, 1865, pages 108, 116 ; 2 Peters, 527 ; 3 Head, 724; 14 New Hamp., 294 ; 8 Ohio, 252; Code of Ga., 1478, (1, 2), 1840.

McCay, J.

1. The general rule of the common law is, that every man dealing with another in reference to property that other may have in his possession, must "take care," *caveat emptor.* The property may be stolen, or borrowed, or pledged, or in the possession of a bailee for some specific purpose, and if so, the party in possession can convey no better or further right than he has himself. Broome's Legal Maxims, (355, 267) ; Irwin's Code, sec. 2597. There are some exceptions to this rule, as where the property is money, or promissory notes not due, and also cases where the conduct of the true owner is such that he is estopped from setting up his title against an innocent purchaser. 3 B. & C., 42 ; 3 Bing. 145. Clearly, however, the mere permission, by the true owner, to a third party, to have possession, is not such an act as estops him. 3 B. & C., 42. Such a rule would place it in the power of

every bailee to dispose of the thing with which he is intrusted, and would seriously interfere with the ordinary affairs of life.

Nor is the case of a factor, who has goods put in his possession for sale, an exception. The goods are not his. He holds them for a specific purpose, and, outside of that purpose, he has no more authority in reference to them, than any other bailee has, outside of the purpose for which *he* holds goods. The goods belong to the true owner. If they be stolen from him, if he lend them, if he deposit them, they remain his, except so far as he clothes another with power over them.

A factor, for the sale of goods, has only power to sell them. For purposes of sale, he is a general agent, and one may deal fairly with him in all matters pertaining to that purpose. Being a general agent for the sale, in all matters within the scope of his agency, his authority is complete. No special orders or limitations of his powers, or directions as to the mode of their exercise, will affect their buying from him without notice, but, if he steps outside of the scope of his agency, if he undertakes to affect the principal's title in any other way than by a sale, he is acting without authority, and nothing passes, any more than if he had been a mere depository. A factor for the sale of goods can not, therefore, *pledge them* for advances made on his own account. This is the settled doctrine, both in England and America, and though there have been, at times, objections made by Judges to the justice of the rule, I have not been able to find a single case in which it is denied. Patterson vs. Tash, 2d Strange, 1182. Martini vs. Coles, 1 Maule & Sel., 146. 5 John. Chan., 429. Story on Agency, sec. 113. Paley on Agency, 214–221. 2d Kent, 627.

The case of Martini vs. Coles, 1 M. & S., 146, was a stronger case than the one at bar. Martini had consigned to his factor goods for sale; the *bill of lading* was to the *factor and his assigns,* and the factor was a *large dealer on his own account.* The factor pledged the goods to Coles to secure advances to himself, and afterwards became a bankrupt. It

was held by the whole Court that the plaintiff was entitled to recover.

It was contended in argument here that, admitting this to be the common law, it is a doctrine not suited to the circumstances of this State, and is not, therefore, within the scope of our adopting Act. The object of the rule is said by Bailey, J., to be, to encourage foreign consignors to send goods to England for, sale. Surely, if it will have that effect, this is the very locality where its influence will be a great public good. Consignments from other States for sale here, in our great want of capital, ought to be encouraged, and the argument is directly in favor of, rather than against, the adoption of the rule. It is exactly suited to our circumstances.

It is said also, that the rule is repealed by 2179, of the Code, (Irwin's.) That section is in these words: "The principal may recover back money, paid illegally, or by mistake of his agent, or goods wrongfully transferred by the agent, *the* party receiving the goods having notice of the agent's want of authority or willful misconduct."

It will be noticed, in the first place, that this latter clause, which is the portion relied on, is, at best, but a negative pregnant. It does *not* declare that, in cases where the party receiving the property had no notice, the principal shall *not* recover.

The fact is, that the section is almost a transcript of section 437 of Story on Agency. The language of Story is: "If an agent tortiously converts the property of his principal, as if he sells or pledges it to a third person, without right or authority, the latter will generally be liable equally with the agent for the conversion." He then adds: "This doctrine applies in all cases, where the third person knew and participated in the illegal or unauthorized act of conversion." Judge Story does not say, nor does this doctrine of the Code say, that the third person will be liable in no other cases.

If the Code is to have that meaning, the whole doctrine of agency is altered. It applies as well to a special as to a general agent, and the law of Georgia is, that any person,

having the actual possession of personal property, as the agent of another, no matter for what purpose, can transfer to a third person a good title, unless that third person has notice of the agent's want of authority. We do not think the section has any such meaning. The whole, at least, of article 2, is to be taken together. Section 2168 had provided that the principal was bound, by all acts of the agent, within the *scope of his authority.* Section 2170 declares that, in special agencies, persons dealing with the agent, *should examine his authority.* Section 2111 provides that even the pawnee of *a promissory note,* without notice, is not protected against the true owner. We cannot believe that it was the intention of the Legislature, by the negative pregnant of section 2179, to contradict the express language it has used in other parts of the Code, and especially in the very article in which the section stands.

Our conclusion is, that section 2179 introduces no new rule. It authorizes a principal to recover back goods wrongfully transferred by his agent, in cases where the transferee had notice, but it does not change the rules regulating the rights of principals against parties dealing with special agents, or with general agents, who act beyond the scope of their agency. These cases stand upon the same footing as do cases where a general agent, with private instructions, disobeys those instructions, and acts improperly with the knowledge of the person dealing with him.

It may not be out of place here to say, that in the argument of this case, there seemed to be a misunderstanding of the rule, in cases of a general agent, as to the extent of his authority, and as to how far his acts bind his principal. A special agent is one appointed to do a single act, or several *specified acts.* Every man deals with such an agent at his peril, and is bound to take notice of the agent's instructions. Story on Agency, sec. 17. A *general* agent may either be one clothed with power to do all the principal's business, of every character, or he may be one empowered to do all acts connected with a *particular business or employment.* Story on Agency, sec 17. Now, the rule as to how far the acts of

VOL. XXXVIII—26.

a general agent shall bind his principal is, that he may bind him by any act *within the scope of his authority.*     Code, 2168. He may do all acts proper for the accomplishment of the end, or such as are usual in matters of this kind.     Story, Agency, sec. 60.     But, he cannot bind the principal by an act outside of the object of his appointment.     2 Kent, 619. 3 Ross Leading Cases, secs. 150, 151.

2d.  Section 2110 of the Code provides that delivery is essential to constitute a pawn.    Indeed, delivery is the very essence of the bailment.    At common law, therefore, incorporeal things, though they might be sold or mortgaged, could not be pawned.    Story on Bailment, sec. 286.    Hence the necessity of the special provision of the Code for the pledging of promissory notes and evidences of debt.    Code, 2110.    There need not, it is true, in all cases, be an actual moving of the thing, as if it be logs in a stream, or any other article usually delivered by transferring the dominion, but there must be such a delivery as the thing is capable of.    The mere setting of a portable article aside, or the pledger consenting to bail it as the bailee of the other, there being in fact no transfer of the custody, however such acts might, in case of a sale, amount to delivery, is not sufficient in case of a pledge or pawn, the very essence of which is deposit. Boleman's Commercial Law, secs. 673, 674.    Story, secs. 287, 288.    Irwin's Code, 2110.

3d.  While, perhaps, the language of Judge Cole is not technically accurate when he says that the facts here amount to *constructive* notice, yet we are clear that they are such strong evidence of notice as must bind the bank, whether because it must have wilfully shut its eyes, or because failure to know, under the facts, was such negligence as that it ought not to be protected, is immaterial.

Judgment affirmed.