ATHERTON et al. v. BEAMAN.

(District Court, D. Massachusetts. January, 1919.)

1. BANKRUPTCY ⬤188(1)—PLEDGE—VALIDITY.

Borrower corporation's agreement of pledge of 50 carloads of lumber stored with a storage company, with provision for substitution of carloads, a "carload" being either the load of a particular car or lumber of the value of $200, was valid, as against the objection of indefiniteness of designation of the property affected by the pledge, and entitled the pledgee to the equivalent of 50 carloads of lumber in the possession of the storage company, as against the corporation's trustees in bankruptcy, although a great part of the lumber had not been received by the storage company in cars, but had been shipped by water, and such part had never been appropriated from the larger mass by the storage company.

2. PLEDGES ⬤11—SUFFICIENCY OF DELIVERY—APPROPRIATION BY WAREHOUSEMAN.

A warehouseman, if authorized by lender and borrower, may make the appropriation of goods to a pledge, though such action involves the exercise of judgment and discretion.

3. CORPORATIONS ⬤432(5)—OFFICER'S INDIVIDUAL INDEBTEDNESS—PAYMENT FROM CORPORATE FUNDS—BURDEN OF PROOF.

Although the presumption is against the regularity of payments of his individual debts by a corporate officer by checks drawn directly upon the corporation, the question is one of fact, and it devolves upon a trustee in bankruptcy of the corporation, litigating as to the amount owing by the corporation to the creditor of such corporate officer, who was also a creditor of the corporation, to establish that the payments were in fact unauthorized by the corporation, and that the creditor had notice of that fact when he received them, and that they have never been ratified.

4. CORPORATIONS ⬤426(7)—IRREGULAR PAYMENT BY CORPORATE OFFICER—RATIFICATION—SILENCE.

Silence and inaction of a corporation's officers and stockholders concerning a payment by a corporation officer of his individual indebtedness by checks drawn directly upon the corporation held to amount to a ratification of such payments.

5. BANKRUPTCY ⬤155—TRUSTEE—IRREGULAR PAYMENT BY CORPORATE OFFICER.

Where officers and stockholders of a corporation in effect ratify irregular payments by a corporate officer of his individual indebtedness by checks drawn directly upon the corporation, by remaining silent and thus preventing the creditor from proceeding against the corporate officer, trustee in bankruptcy of corporation could not contend that corporate officer was not authorized to draw such checks.

6. BANKRUPTCY ⬤287(3), 293(1)—BILL IN EQUITY.

Trustees in bankruptcy may resort to a bill of equity in the District Court to protect their right to the possession of lumber belonging to the bankrupt, as against one claiming a right to possess 50 carloads out of a larger lot, who interfered with the efforts of the trustees to obtain possession of any of the lumber; and the fact that, in order to determine to what extent the defendant's action was justified, it is necessary to decide the controversy, does not oust the jurisdiction of the court.

In Equity. Bill by Percy A. Atherton and others, trustees in bankruptcy, against Nathaniel P. Beaman, to obtain certain lumber in possession or custody of a storage company, and seeking an injunction against the defendant, who had taken action to prevent the delivery of the lumber to the trustees. The matter having been referred to a ref-

eree as special master to state the facts, the case comes before the court on exceptions to his report and on a motion for a decree made by the defendant. Decrees ordered to be entered overruling all exceptions to the master's report and confirming said report, except as to certain matters, and dismissing the bill upon the merits. See, also, 243 Fed. 930.

Foster & Turner, of Boston, Mass., for Nathaniel P. Beaman.
Swift, Friedman & Atherton, of Boston, Mass., for trustees.

MORTON, District Judge. This is a bill in equity, brought by the trustees in bankruptcy of the Parsons Manufacturing Company to obtain certain lumber in the possession or custody of the Eastern Storage Company. Beaman, the defendant, claimed a large part of the lumber on the ground that it had been pledged to him by the bankrupt as security for a loan of $10,000, and he had taken action to prevent the delivery of any of it by the storage company to the trustees. The bill seeks an injunction against such action by him. The storage company makes no claim to the lumber, except for its proper storage charges, which all parties are willing should be paid. The case was referred to Referee Olmstead as special master to state the facts. The questions now before the court arise on exceptions to his report, and on a motion for a decree made by the defendant. Pending the case, by agreement of parties, the lumber has been sold, the proceeds to stand like the original property.

The material facts, which for the most part are not seriously in controversy, are as follows: About 2½ years before the petition in bankruptcy, against the Parsons Manufacturing Company was filed, Beaman, who owned practically all of its stock, sold out his holdings. One of the buyers, Gerrish, who had previously been associated with Beaman in the company, continued as its treasurer. In connection with this transaction, Beaman loaned the company $10,000. This loan was secured in the following manner: The Parsons Manufacturing Company habitually carried on storage with the Eastern Storage Company large amounts of lumber. This lumber came to the storage company by rail. Each carload was piled by itself, and the pile was marked with the carload number and the initial "P. M. Co." The Parsons Manufacturing Company gave Beaman the order on the Eastern Storage Company, which is stated in full in the referee's report, and which was accepted by the storage company as therein stated. In further protection of the security, the agreement of September 4, 1914, which also appears in full in the referee's report, was entered into between the parties.

Briefly stated, the Parsons Manufacturing Company directed the storage company to hold at all times 50 carloads of its lumber to the order of Beaman, and agreed to keep that amount of lumber in the storage company's possession subject to his order, and the storage company accepted the order. The Parsons Manufacturing Company reserved the right to use any carload of lumber thereby covered by substituting another equally valuable one for it. No specific carloads or piles of lumber were appropriated to this pledge by the storage com-

pany until November, 1916, shortly before the failure. At the time when this arrangement was entered into, the learned referee finds—and, though his finding is attacked by the trustees, I see no sufficient reason to doubt the correctness of it—that the Parsons Manufacturing Company was doing a prosperous business and was entirely solvent. The fact that Gerrish and his associates, who were familiar with the company's affairs, paid $20,000 for its capital stock, is nearly conclusive evidence on these points. In November, 1916, it was undoubtedly insolvent.

Following the Beaman transaction above described, the Parsons Company continued to do business as before with the storage company, shipping in and taking out comparatively large quantities of lumber, and keeping at all times a considerable stock with the storage company. From time to time it pledged certain specified carloads of lumber in the possession of the storage company to various banks for loans. In such instances the storage company was notified, was given a list of the carloads affected by the pledge, and agreed to hold them for the account of the pledgee. Beaman does not attack those transactions, and no question arises as to them.

In November, 1916, the manager of the storage company called the attention of the Parsons Company to the fact that there was not enough of its lumber with the storage company to fill the pledge orders which had been given to various banks and Mr. Beaman, which had been accepted by the storage company. At that time the Parsons Manufacturing Company had a cargo of water-borne lumber on the wharf of the Hall Lumber Company, and it at once arranged with the storage company that this lumber should be put at the latter's order to make up the deficiency. The wharfingers were duly notified, and the effect of what was done was to bring the lumber on the wharf into the control and constructive possession of the storage company. Aside from the wharf lumber, there were several carloads of lumber in the possession of the Storage Company pledged to nobody, unless to Beaman. With the wharf lumber there was more than enough to make up 50 carloads applicable to him.

There was no actual appropriation by the storage company of any particular lumber at the wharf to the Beaman order at that time; but there can be no doubt that the storage company supposed that it was holding 50 carloads on storage for Beaman's account. A carload is referred to in the agreement as representing $200 in value, and was so treated by the parties. Beaman was not notified of the arrangement made between the Parsons Manufacturing Company, the storage company, and the wharfingers concerning that lumber. He never at any time took formal possession of any specified lumber. He relies on a constructive possession, or right of possession, arising out of the bankrupt's order of September, 1914, and the acceptance thereof by the storage company.

[1] The situation last described continued until the filing of the involuntary petition against the Parsons Manufacturing Company on December 9, 1916; and the question is whether at that time Beaman had a valid and enforceable pledge or lien on 50 "carloads" of the lumber in the possession or control of the storage company. The only

possible doubt arises out of the indefiniteness of the designation of the property affected by the pledge. As above noticed, a "carload," as used by the parties, represented either the load of a particular car, which was kept separate by the storage company, or lumber of the value of $200. As to the lots which had come in on cars, and were capable of identification, and were not appropriated to other pledges, there seems to be no doubt that Beaman is entitled to them.

[2] As to whether the storage company may separate out enough of the water-borne lumber to make up the 50 carloads, no decision has been called to my attention covering the point. The question appears to be whether a warehouseman may be authorized to make the appropriation of goods to a certain pledge, where such appropriation involves the exercise of judgment and discretion. The original agreement provided for the substitution of cars, and also introduced the element of value; i. e., "of the average value of $200 per car." (Agreement of September 4, 1914.) Both parties authorized changes in the pledged property, and in permitting them the storage company acted with the assent of both. Such an arrangement does not seem to me legally objectionable or ineffective; it is not radically different from what is regularly done with reference to grain stored in elevators. Lumber is a recognized article of commerce, and has a value ascertainable within close limits. If that from the wharf had been carted to the storage company's place, and had there been separated out into so-called "carload" lots, and some of these lots had been appropriated by the storage company to Beaman's pledge, it seems to me that he would be entitled to them, as against the trustees. There being no fraud or bad faith, I see no sufficient reason why that appropriation might not be made by the storage company at the wharf at any time before it relinquished custody of the property. As the arrangement was unobjectionable when entered into, I think that the parties should be protected as long as they acted in good faith in carrying it out.

[3-5] A further question has been argued as to the validity and amount of Beaman's claim. The trustees seek to offset against the amount due on his loan (for which a promissory note was given) certain payments made—improperly, it is alleged—by Gerrish to Beaman from the funds of the Parsons Company. Gerrish was indebted to Beaman personally. Checks were drawn by Gerrish directly from the company to Beaman and were delivered in payment of Gerrish's personal obligation. The plaintiffs contend that at the time when Gerrish made these payments he was already indebted to the Parsons Company, that the presumption from the way in which the payments were made is against their validity, and that Beaman was put upon notice that Gerrish was using the company's money in a way in which he had no right to use it.

I agree with the plaintiffs that the presumption is against the regularity of such payments as have just been described (Fillebrown v. Hayward, 190 Mass. 472, 77 N. E. 45; Johnson v. Longley Luncheon Co., 207 Mass. 52, 92 N. E. 1035); but the question is one of fact, and it devolves upon the plaintiffs in this instance to establish that the payments were in fact unauthorized by the Parsons Company, that Beaman had notice of that fact when he received them, and that they

have never been ratified. Those facts are not established by the evidence. The weight of a presumption of this character is greatly lessened when all the circumstances of the transaction are before the court. Gerrish testified, and various other witnesses. On all the evidence, and giving due weight to the presumption, it does not appear that, in using the funds of the Parsons Company to pay his personal debt to Beaman, Gerrish was acting in fraud of other persons interested in the company. Moreover, he had been making such payments for several years. There is no evidence that they were not known to his fellow officers and directors, who owned nearly all the stock, and who did not object. In justice to Beaman, if objection was to be made, it should have been made seasonably in order that he might proceed against Gerrish. The silence and inaction of the company's officers and stockholders amounted to a ratification by it of said payments. The trustees have, under such circumstances, no greater rights than the corporation. In re National Piano Co. (D. C.) 42 Am. Bankr. Rep. 111, 252 Fed. 950, citing cases, to which may be added Ratcliff v. Clendenin, 36 Am. Bankr. Rep. 561, 232 Fed. 61, 146 C. C. A. 253.

[6] The defendant contends that this court has no jurisdiction of the controversy. The general title to all the lumber was in the trustees, subject only to the rights of the pledgees. The storage company never made any adverse claim to it. Beaman did not claim certain specified piles or separate lots of lumber; he made a general claim to 50 carloads out of a larger lot. As to so much of the lumber as is not covered by pledges, there can be no doubt, on the record before me, of the right of the trustees to an immediate possession. Beaman having interfered with the efforts of the trustees to obtain possession of any of the lumber, they were, I think justified in bringing their bill here to prevent interference with the property of a bankrupt estate. The fact that, in order to determine to what extent Beaman's action was justified it is necessary to decide the controversy, does not oust the jurisdiction.

Decrees may be entered, overruling all exceptions to the master's report, and confirming said report, except as above stated, and dismissing the bill upon the merits.