## In re HEYWARD–WILLIAMS CO. Interventions of EQUITABLE TRUST CO. OF NEW YORK et al. HOPKINS v. SHAWMUT NAT. BANK.

(District Court, S. D. Georgia. November 10, 1922.)

1. **Warehousemen ⟂15(3)—Title to specific bales of cotton held not to have passed to pledgees of bankrupt under "blanket receipts."**

Where "blanket receipts" for cotton stored were issued by warehouse company to factor, who delivered such receipts to pledgees, *held* that, although the receipts, by stating the marks, etc., were sufficiently definite to cover specific bales, yet, there being no intention on the part of the warehouseman that specific bales should be covered by such receipts, and such intention being known to factor, title to specific bales did not pass on delivery of the receipts to the pledgees.

2. **Bankruptcy ⟂161(1)—Action of pledgor in furnishing memoranda to pledgees of private marks of cotton to which they were entitled under blanket receipts held not a preference.**

Action of insolvent pledgor in furnishing within four months of bankruptcy memoranda to pledgee banks of the private marks of cotton to which they were entitled under blanket receipts was not a preference under the Bankruptcy Act (Comp. St. §§ 9585–9656), not being done to secure a pre-existing debt, but being done in good faith, to make effective a pledge originally executed for a present valuable consideration.

3. **Warehousemen ⟂15(3)—Identification of cotton under blanket receipts held not to pass title.**

Action of pledgor in furnishing memoranda to pledgee banks of the private marks of cotton to which they were entitled under blanket receipts was not effective to pass title retroactively as of the date of the issuance or pledge of the receipts.

4. **Bankruptcy ⟂188(3)—Warehousemen ⟂20—Pledgees held to have equitable lien on cotton under blanket receipts; equitable lien on cotton held good against bankruptcy trustee.**

Although pledgees of "blanket receipts" of stored cotton did not have title to specific bales, *held*, that they had an equitable lien on or right to cotton held against such outstanding receipts, although frequently changed by substitution, definiteness of description or identification not being essential; and such right was valid against the bankruptcy trustee of the pledgor corporation, which did not own the cotton, but had merely claims against its respective customers, the owners thereof, for storage, insurance, and advances, secured by liens upon the cotton, so that, in view of Park's Code Ga., § 5948, providing that a judgment is not a lien on choses in action, the 1910 amendment to Bankruptcy Act, § 47a (Comp. St. § 9631), as to rights of trustee as to bankrupt's property was inapplicable.

In Bankruptcy. In the matter of the Heyward-Williams Company. Intervention of Equitable Trust Company of New York and J. A. Marvin, Jr. Suit by one Hopkins, as trustee, against the Shawmut National Bank. Judgment ordered in accordance with opinion.

McIntire, Walsh & Bernstein, of Savannah, Ga., for trustee.

Anderson, Cann & Cann and Isaac & Isaac, all of Savannah, Ga., for Equitable Trust Co.

W. L. Clay, of Savannah, Ga., for Shawmut Nat. Bank.

BARRETT, District Judge. The Heyward-Williams Company was a cotton factor in Savannah, Ga. The Savannah Warehouse & Compress Company was, as indicated by its name, engaged in the warehouse

business. The arrangement between such factor and such warehouse company was that all cotton shipped to the factor by its customers was placed in one of the compartments, from 1 to 6, of the warehouse company, and such cotton was stamped or tagged "H.-W. Co." In addition to such stamp or tag, the bales of cotton had the private marks of the shippers. When requested, the warehouse company would issue to Heyward-Williams Company a warehouse receipt, upon which would appear the private marks of the cotton. In such case the particular bales bearing such marks would be kept by the warehouse company and not delivered, except upon the presentation of the receipt covering the same. The warehouse company would also issue receipts for cotton in which the only designation of the cotton would be the number of bales, marked "H.-W. Co.," and stored in compartments from 1 to 6. These were known as "blanket receipts." The obligation of the warehouse company under such receipts was merely to retain the number of bales marked "H.-W. Co." represented by the outstanding receipts so marked. All specific bales were constantly changing. Many thousand bales were handled during a season, and it might happen that when such warehouse receipts should be presented to the warehouse, either canceled or for the delivery of the cotton, there would be on hand none of the cotton that was on hand when the receipts were actually issued, but there would be on hand the number of bales of cotton corresponding to the aggregate of such receipts. At times there was what is known as free cotton—that is, cotton marked "H.-W. Co.," in addition to the private marks of the shippers—for which receipts had not been issued. None of the cotton involved in this controversy belonged at any time to Heyward-Williams Company, but all of such cotton was held by it as a cotton factor, and as such factor it had a lien on the cotton for advances, storage charges. insurance charges, commissions, and the like.

The Heyward-Williams Company filed its voluntary petition in bankruptcy at 5:30 o'clock p. m. on January 25, 1922, and was adjudicated bankrupt at 6 p. m. More than four months prior to that time there had been issued to it by the warehouse company receipts for cotton marked merely "H.-W. Co.," showing the number of bales, and that they were in compartments from 1 to 6. Prior to four months before such bankruptcy the said Heyward-Williams Company had borrowed from the Equitable Trust Company and from the Shawmut National Bank large sums of money, for the security of the payment of which such receipts had been endorsed to the said banks. Payments had been made to the respective banks by the said Heyward-Williams Company, and certain of the receipts so indorsed had been called in and canceled, until a few days before such bankruptcy there was owing to the Equitable Trust Company the sum of $37,121.70, such bank holding receipts for 212 bales of cotton, and to the Shawmut National Bank the sum of $11,296, which held receipts for 165 bales. A few days prior to the bankruptcy the Shawmut National Bank applied to the Heyward-Williams Company for payment, and, upon payment not being made, then presented its receipts to the warehouse company and demanded the delivery of the cot-

ton covered thereby. The warehouse responded that it was not able to identify which cotton was covered by such receipts. Thereupon the bank applied to the Heyward-Williams Company, and was furnished by it with a list of cotton showing the private marks of each bale (by private mark being meant the shipper's or customer's mark), and then the bank presented this list to the warehouse company, which at 5:30 o'clock p. m., January 25, 1922, issued to the bank a receipt covering the bales as set forth in such list. The Equitable Trust Company made a like demand for payment, and a like demand for the delivery of the cotton covered by its receipts, aggregating 212 bales. A like response was made, and a like list of cotton, with the private marks, aggregating 212 bales, was furnished by Heyward-Williams Company, and a demand was made upon the warehouse company for the issuance of a receipt or receipts covering such cotton; but this demand was not until after the filing of the petition in bankruptcy, and the new receipt was not issued.

The Equitable Trust Company instituted bail trover proceedings against the warehouse company subsequent to the filing of the bankruptcy petition. Thereafter the receiver in bankruptcy of the Heyward-Williams Company filed its petition against the Equitable Trust Company to restrain the prosecution of such suit, averring that the receipts issued by the warehouse company to the Heyward-Williams Company, and containing merely a statement of the number of bales, marked "H.-W. Co.," and stored in compartments 1 to 6, was not sufficient identification to pass title, and that no title passed to the Equitable Trust Company by the indorsement of such receipts; that petitioner, who was subsequently succeeded by the trustee in bankruptcy in such litigation, stood in the position of a judgment lien creditor, and that the property was the property of the bankruptcy estate, and should be so administered. Thereafter said receiver, who was in turn succeeded in the litigation by the trustee in bankruptcy, instituted suit against the Shawmut National Bank, making like averments as to the receipts issued by the Heyward-Williams Company, and by it indorsed to the Shawmut National Bank, and, further, that at the time the warehouse company issued to the Shawmut National Bank its receipt for the 165 bales of cotton there was no present consideration paid by the said bank for such receipt, and that said cotton was the property of the estate in bankruptcy, and said bank should be required to turn the said cotton or the proceeds thereof over to the trustee.

Certain customers of the Heyward-Williams Company have intervened, established title to the cotton, and, upon paying the advances owing thereon, have been allowed to take their cotton. There is no controversy as to their rights, thus insisted upon. There was testimony. unrebutted, to the effect that the method of doing business as stated above was the general custom in Savannah. It is not shown that said custom of substitution was known to the Equitable Trust Company or to the Shawmut National Bank, though it may have been known by both of them. The cotton has been disposed of, but by the terms of the order or agreement of sale the rights of the parties attach to the proceeds.

[1] 1. These two cases will be considered together, for the controlling principles apply to both. If the banks had no other information than the receipts, they were justified in believing that they held as security specific bales of cotton. While the receipts did not state the numbers of the bales, they did state their marks, and the compartments in which they were stored, and how many bales there were. While not as complete as is practicable or desirable, the receipts were sufficiently definite to cover specific bales. However, the well-established custom in Savannah, followed by these factors, deprived the receipts of such effect. While it is true that, where a pledge is legally complete, the rights of the pledgee "cannot be affected by the methods of dealing between the pledgor and the warehouseman, by which a withdrawal of the pledged property and the substitution of other property of the same kind are permitted without the pledgee's knowledge or consent" (Bush v. Export Storage Co. [C. C.] 136 Fed. 918), and it is not satisfactorily shown in this case that the banks knew of such practice of substitution, it is nevertheless true that there was no intention on the part of the warehouseman or factor that specific bales should be covered by such receipts, and the subsequent construction by others of the meaning of such receipts, however well warranted, cannot change their original meaning. The title to specific bales did not pass upon the delivery of the receipts.

2. Did the subsequent action of the factor in furnishing memoranda to the banks of the private marks of the cotton to which they were entitled under the receipts serve to retroactively pass the title at the time of the delivery of the receipts? And, if so, was such action in furnishing such marks giving a preference in violation of the Bankruptcy Act (Comp. St. §§ 9585–9656)?

[2] Answering the latter question first, it was not a violation of the Bankruptcy Act, for it was not done to secure a pre-existing debt, but was an act demanded by good faith, to make effective an instrument or pledge originally executed for a present valuable consideration. Atherton v. Beanan (D. C.) 256 Fed. 871; Id. (C. C. A.) 264 Fed. 878; Wilder v. Watts (D. C.) 138 Fed. 426; McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554. The principle, though not the identical question, is decided in The Idaho, 93 U. S. 575 (7), 23 L. Ed. 978.

[3] The duty of the factor, when called upon by the pledgees, was to as near as practicable make effective the contracts upon which the loans were made; but they could not do the impossible, and but little, if any, of the cotton in the warehouse when the receipts were issued was there at the time of bankruptcy, and probably none of the cotton in the warehouse at the time of bankruptcy was there when the receipts were issued. The identification of the cotton prior to bankruptcy was not effective to pass title as of the date of the issuance or pledge of the receipts.

[4] 3. While the title did not pass at the time of the execution of the receipts, it is certain beyond question that it was the expectation of the lenders and the intention of the factor that the lenders should have as their security the number of bales of cotton represented by the receipts, or, at least, the interest that the factor had in such bales. In

the absence of some controlling fact or condition that prevents the making effective such expectation and intention, no court should interfere therewith.

"The conduct of business men acting without lawyers and in good faith, attempting to create a personal security for an actual debt, should be fairly construed as actually effecting what the parties meant." Sexton v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995.

"Courts may go far in giving financial transactions between banks and customers any form which will carry out their mutually understood intent." National City Bank v. Hotchkiss, 231 U. S. 50, 34 Sup. Ct. 20, 58 L. Ed. 115.

"An informal business transaction should be construed as adopting whatever form consistent with the facts as is most fitted to reach the result seemingly desired." Barnes v. Alexander, 232 U. S. 117, 34 Sup. Ct. 276, 58 L. Ed. 530.

4. It is urged that, inasmuch as there was no identification of the cotton at the time of the delivery of the receipts to the lenders and that the subsequent designation of the bales to be covered could not have a retroactive effect, there could not exist an equitable lien. There is ample authority to sustain this contention. 21 Corpus Juris, p. 119, and notes; Pomeroy's Equity Jurisprudence (3d Ed.) vol. 3, § 1235; 25 Cyc. 665, 666; Jones on Pledges and Collateral Security, § 317; Interstate Banking & Trust Co. v. Brown, 235 Fed. 32, 148 C. C. A. 526; First National Bank of Paris v. Yerkes, 238 Fed. 278, 151 C. C. A. 294; Ferguson v. Northern Bank of Kentucky, 14 Bush (Ky.) 555, 29 Am. Rep. 418.

There are, however, more convincing authorities to the effect that no such definiteness of description is essential to the creation of an equitable lien, or at least to the creation of an equitable priority, whether denominated a lien or otherwise.

"Equity looks at substance and not at form. An advance payment for coal yet to be mined may be a pledge on the coal, and in that event, as in this case, the trustee in bankruptcy takes the mine subject to the obligation to deliver the coal as mined to the extent of the advancement." Hurly v. Atchison, T. & S. F. Ry. Co., 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729.

"Where a debtor, by an agreement with a creditor, sets apart a fixed portion of a specific fund in the hands, or to come into the hands, of another person, whom he directs to pay it to the creditor, the agreement is, when assented to by such person, an appropriation, binding upon the parties and all who, having notice, subsequently claim under the debtor an interest in the fund." Ketchum v. St. Louis, 101 U. S. 306, 25 L. Ed. 999.

In this case the lien was upon funds, not only not segregated, but not earned.

"Interveners made advances to defendant corporation, which was operating a central sugar refinery and a number of plantations, to enable it to carry on its business through the season, under a written contract by which the company agreed to ship all sugar products made at its refinery to interveners, who were to apply the proceeds in payment of the advances. Such advances, however, largely exceeded the amount called for by the contract. What sugar was shipped from the refinery was shipped to interveners; but, owing to a scarcity of cars, it accumulated in the refinery, and a quantity remained there at the time of the appointment of a receiver for the company. Held, that interveners were entitled to an equitable lien upon the sugar so remaining in the hands of the receiver, as against general creditors, under the maxim that equity regards that as done which ought to be done." Howard v. Delgado & Co., 121 Fed. 26, 57 C. C. A. 270.

"Where complainant purchased a quantity of lumber, to be manufactured and shipped to it by the bankrupt, advancing large sums before the lumber was sawed, complainant acquired an equitable lien on lumber piled in the yards of the bankrupt and intended to be applied on complainant's contract for the balance of the advances, etc., which was enforceable as against the bankrupt's trustee." Gage Lumber Co. v. McEldowney, 207 Fed. 255, 124 C. C. A. 641.

While the necessity for delivery, in order to constitute a valid pledge, is not identical with the necessity for definitely specifying the property, the cases establishing equitable liens in the absence of delivery are illuminating in the cases of nonidentification. That delivery is not essential to create an equitable lien, see McDonald v. Daskam, 116 Fed. 276, 53 C. C. A. 554, where it is said:

"A mortgagor corporation procured a loan from a bank under a parol agreement by which the mortgagee was to become surety therefor, and the mortgage, together with the insurance on the mortgaged property, which was payable to the mortgagee, was to be given as collateral security. The policies of insurance were in the hands of the agent from whom they were procured, who held them for the parties interested. Advances were made by the bank, under the agreement, from time to time, on drafts drawn by the corporation on the mortgagee; and subsequently the corporation executed its note covering the same, in favor of the mortgagee, who indorsed it to the bank. The note contained a clause reciting the deposit with the payee of 'certain property, as stated below, as collateral security,' with the further description, 'Fire insurance policies, should fire occur.' The mortgage was delivered to the bank, but the policies remained in the hands of the agent until the property was destroyed by fire. Held, that the parol agreement respecting the insurance was not supplanted by the written agreement in the note, but, being consistent, the two should be construed together, and, so considered, did not create a common-law pledge of the policies, to the validity of which an actual delivery was essential, but an equitable assignment of a beneficial interest in the policies, should a fire occur, which gave the mortgagee, on his payment of the bank's debt, a lien on the proceeds of the policies for the amount thereof, in addition to the amount of his mortgage debt."

And Wilder v. Watts (D. C.) 138 Fed. 426, to the effect that:

"Where an alleged bankrupt before insolvency arranged to borrow money to purchase goods, under an agreement that he would have the goods insured, and assign the policies to the lenders as collateral security, and loans were made to him, the agreement operated as a valid equitable assignment of the policies, though they were not delivered when issued, nor actually assigned until after loss, when the borrower was insolvent."

It is certain that, even though the banks have no "equitable lien," they have this equitable right, viz. that they should receive a certain number, according to their receipts, of the bales marked "H.-W. Co." and found in the warehouse of the Savannah Warehouse & Compress Company. Even though cotton be not fungible, and giving full effect to the known custom of the cotton business in Savannah, the cotton held by the warehouse company against its outstanding receipts, though specifics have been frequently changed by substitution, may be fairly treated as a "fund" intended as security for these debts. Thus treated, the case comes clearly within the principle of Ketchum v. St. Louis, 101 U. S. 306, 25 L. Ed. 999; Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855; Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865; Johnson v. Gordon, 102 Ga. 350, 30

S. E. 507; 3 Pomeroy's Equity Jurisprudence, § 1233, where it is thus stated:

"The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. * * * The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, 'Equity regards as done that which ought to be done.'"

That a right of the kind discussed is recognized in equity, though at the same time recognizing that an "equitable lien" was not created, is illustrated in the case of Atherton v. Beaman, decided by District Judge Morton, as reported in 256 Fed. 871, and by the Circuit Court of Appeals of the First Circuit, as reported in 264 Fed. 878. In that case the storage company was ordered to place 50 cars of lumber, which it had on storage, subject to the creditor's order, with the right of substitution. In the course of time the storage company did not have 50 cars of lumber on hand, and thereupon the debtor arranged to place with the storage company certain lumber that had come in on ship. It was held that the transaction did not create a valid pledge, and further, that the setting aside of this lumber that had come in on board ship only a short while before the bankruptcy of the debtor was not invalid as against the trustee in bankruptcy, there being no fraud in the transaction, "as the designation related back to the date of the order."

5. Relative to such cotton, what are the rights of the trustee in bankruptcy of the Heyward-Williams Company, and when did they become effective?

"It is well settled that the trustee takes, not as an innocent purchaser, but subject to all valid claims, liens and equities. * * * A trustee in bankruptcy stands in the shoes of the bankrupt, and has no better title than he had at the time of the filing of the petition, except so far as the status is modified by fraud of the bankrupt, or as condition's may have been changed by the amendment of 1910 of section 47a (2), so far as the right of the trustee to attack fraudulent transfers or liens is concerned." Collier on Bankruptcy (12th Ed.) pp. 1117–1119.

The amendment of 1910 of section 47a (2) is as follows:

"And such trustees, as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied." Comp. St. § 9631.

The maximum right that the trustee has is under this amendment, for no one claims that the bankrupt could have set up any claim to this cotton as against the banks. All of the cotton, except that for which the warehouse company issued its receipts to the Shawmut National Bank, came into the custody of the bankruptcy court. As to such cotton

covered by the receipt to the Shawmut National Bank, there may be some question as to whether it came into the custody of the bankruptcy court. The result will be the same in either event. If it came into the custody of the bankruptcy court, the trustee became "vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings there." If it did not come into the possession of the bankruptcy court, the trustee became "vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied."

If the cotton at the time of the filing of the petition in bankruptcy (for then it was that the property came in custodia legis—Collier on Bankruptcy [12th Ed.] § 47a[7]) had been the property of the bankrupt, it is manifest that the trustee would occupy the position of a judgment creditor, and the contest would·then be between this legal lien and the rights of the banks. But the bankrupt did not own this cotton. All that it owned was its claims against its respective customers for storage, insurance, and advances, which claims were secured by liens upon such cotton. In other words, the bankrupt was the owner of choses in action secured by a lien, and nothing more.

"No doubt a factor who has made advances upon goods consigned to him, may be regarded, in a limited sense, and to the extent of his advances, as an owner. Yet, in reality, he has but a lien with a right of possession of the goods for its security. He may protect that possession by suit against a trespasser upon it, and he may sell the property to reimburse advances, remaining, however, accountable to his consignor for any surplus. But after all he is not the real owner. He is only the agent of the owner for certain purposes. The owner may, at any time before his factor has sold the goods, reclaim the possession upon paying the advances made, with interest and expenses. He has not lost his ownership by committing the custody of the goods to a factor and by receiving advances upon them. He is still entitled to the proceeds of any sale which may be made, even by his agent, the factor, subject only to a charge of the advances and expenses. A factor, therefore, notwithstanding he may have made advances upon the property consigned to him, has but a limited right. That right is sometimes called a special property, but it is never regarded as a general ownership. At most, it is no more than ownership of a lien or charge upon the property. Such is unquestionably the doctrine of the common law. And there is nothing in any statute affecting this case that changes the doctrine. Certainly the statutes of Georgia, whence this case comes, have no such effect. In the Code of that state of 1861, while a factor's lien is recognized and declared to extend to all balances on general account, and to attach to the proceeds of sale of goods consigned as well as to the goods themselves, there is nothing that declares he has anything more than a lien protected by his possession. Injuries to that possession may indeed be redressed by action in his name, and it may be assumed that upon contracts of sale made by him he may sue; but all of this is perfectly consistent with the continuance of the general ownership in his consignors until he has made a sale. And there is a very significant clause in the statutes of that state which shows that a factor there has not the general property. In section 2969, of the article respecting injuries to personalty generally, it is enacted that 'in cases of bailments, where the possession is in the bailee, a trespass, committed during the existence of the bailment will give a right of action to the bailee for the interference with his *special property,* and a concurrent right of action to the bailor ·for interference with his *general property.*' If this applies to the case of bailment to a factor, as is supposed by the defendant in error, it is clear declaration that the factor's right does not extend beyond a special property, a mere right to hold for a particular purpose, and that it does not amount to ownership of the property consigned to him.

And there is nothing in the new Code of Georgia, or in any of the decisions of the Supreme Court, that is variant from this. Admit that a factor may maintain an action when his possession is disturbed, still it is a question what may he recover? Under the statutes of Georgia he can recover only for the injury which his special property, namely, his lien, has sustained. For all beyond that the general owner may sue. The property of that owner is not vested in his factor." United States v. Villalonga, 23 Wall. (90 U. S.) 41, 23 L. Ed. 64.

"The factor had a lien at common law for advances and expenses, and the Code provision is a simple recognition of the common-law lien of the factor. His lien is a strict common-law lien; that is, one asserted by retention of the property upon which the lien is claimed, and lost by a surrender of the property. It can only be enforced by a sale in accordance with the usages of trade, there being no statutory provision authorizing the foreclosure of such a lien, as is true of other liens. A factor is a mere agent, and his power is governed by the general rules which prescribe the power of an agent." Willingham v. Rushing, 105 Ga. 72, 75, 31 S. E. 130, 131.

"Where personal property was pledged as collateral security for the payment of a promissory note, and the pledgor died, the legal title to the property pledged was so far vested in his estate as to render such property liable for the payment of the widow's year's support as against the claim of the creditor holding the note secured by the pledge." Ullman v. Brunswick Title Guarantee & Loan Co., 96 Ga. 625 (3), 24 S. E. 409.

And certain it is that, if the title does not pass to the pledgee, much less would it pass to a factor whose security is only a lien. But a judgment is not a lien on choses in action.

"A judgment has no lien upon promissory notes in the hands of the defendant; nor are choses in action liable to be seized and sold under execution, unless made so specially by statute." Park's Code of Georgia, § 5948.

"An assignment of the chose in action by the debtor before the institution of such collateral proceeding [garnishment] passes to the assignee the property of the debtor in the chose in action assigned, freed from the lien of the general judgment previously rendered against the assignor." Fidelity & Deposit Co. of Baltimore v. Exchange Bank of Macon, 100 Ga. 619, 28 S. E. 393.

All that passed to the banks by reason of the assignment by the bankrupt of the warehouse receipts was the interest of the bankrupt in the cotton covered by the receipts; that is to say, the claims of the bankrupt against its several customers with the lien securing the same. The title to the cotton did not pass. First National Bank v. Nelson, 38 Ga. 391, 95 Am. Dec. 400; National Exchange Bank of Augusta v. Graniteville Manufacturing Co., 79 Ga. 22, 3 S. E. 411.

The property in controversy being such as is not affected by the lien in favor of the trustee in bankruptcy, and therefore the amendment of 1910 to section 47a of the Bankruptcy Act having no effect, the result is that the controversy is to be governed by the bankruptcy law, independent of such amendment. The result of this is that the claim of both banks is superior to the claim of the trustee in bankruptcy.

6. As a result of the foregoing reasoning, the respective customers of the bankrupt are entitled to recover the cotton consigned by them upon payment of the commissions, storage and other charges, and advances; such collections to go to said banks.

Judgment will be entered in accordance with the foregoing opinion.